**LADUE LOCAL LINES, INC., Appellant,**

v.

**BI–STATE DEVELOPMENT AGENCY OF THE MISSOURI–ILLINOIS METROPOLITAN DISTRICT, Appellee.**

**No. 19941.**

United States Court of Appeals,
Eighth Circuit.

Oct. 27, 1970.

---

John H. Lashly, St. Louis, Mo., for appellant; William I. Rutherford and Michael C. Walther, St. Louis, Mo., on the brief.

Thomas J. Guilfoil, St. Louis, Mo., for appellee; Jim J. Shoemake, St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, ME-HAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

This action was brought under the antitrust laws of the United States, 15 U.S.C.A. §§ 2 and 15. Plaintiff Ladue Local Lines, Inc., is a Missouri corporation engaged in private bus transportation in the metropolitan St. Louis area, which includes parts of eastern Missouri and western Illinois. Suit was brought against the Bi-State Development Agency of the Missouri-Illinois Metropolitan District (hereinafter Bi-State), organized and operating under the laws of Missouri and Illinois. Plaintiff claims that defendant's monopolistic control of the public transportation market has destroyed Ladue's business by excluding it from bidding and servicing schools and school systems. Bi-State moved to dismiss on the ground that it was a body politic created by and under the laws of the States of Illinois and Missouri and the United States, exercising the powers of those sovereigns and therefore not subject to suit under the antitrust laws of the United States.

The district court, 303 F.Supp. 560, the Honorable James H. Meredith, presiding, granted the motion to dismiss. The district court held that defendant's acquisitions of other bus lines[1] had been approved by the Interstate Commerce Commission and as such defendant was specifically exempted from the operation of the antitrust laws under 49 U.S.C.A. § 5(11). Ladue appeals. We affirm the dismissal. We find that Bi-State is a joint or common agency of the States of Missouri and Illinois and that its entry into the field of public transportation is conducted pursuant to legislative authorization of those states and therefore not subject to the antitrust laws.

The complaint acknowledges that Bi-State is organized as a body corporate and politic pursuant to Mo.Rev.Stat. § 70.370 and Ill.Rev.Stat. C. 127, § 63r–1. These statutory provisions enact a compact entered into by the States of Illinois and Missouri for the creation of a bi-state agency for the "faithful cooperation in the future planning and development of the bi-state metropolitan district." As established by the compact, the governing body of the Bi-State Development Agency consists of ten commissioners, five voters of each state, all of whom reside within the bi-state district. Each state reserves the right to provide by law for the veto power of its governor over the action of any commissioner. In 1949, when the compact was initiated, the defendant was given powers, *inter alia*, to plan, own and

---

1. In April 1963, Bi-State acquired the operating rights and certain properties of fifteen companies engaged in bus operations in the metropolitan district. These acquisitions were approved upon application to the I.C.C. See Bi-State Development Agency—Pur.—Vandalia Bus Line, 93 M.C.C. 579 (1964).

maintain bridges, tunnels, airports and terminal facilities; to help coordinate streets, highways, parkways, parking areas, water supply and sewerage and disposal works, recreational and conservation facilities and land use patterns. The agency was empowered to charge and collect fees for the use of the facilities and was given the general power to perform all other necessary and incidental functions. Provision was also made for the exercise of such additional powers as conferred upon it by the legislatures of the states or by act of Congress.[2]

In 1959 the compact was amended by identical Missouri and Illinois statutes. The Missouri statute, Mo.Rev.Stat. § 70.373 (1959), V.A.M.S., reads in part:

"In further effectuation of that certain compact between the states of Missouri and Illinois heretofore made and entered into on September 20, 1949, the Bi-State Development Agency, created by and under the aforesaid compact, is authorized to exercise the following powers in addition to those heretofore expressly authorized by the aforesaid compact:

"(1) To acquire by gift, purchase or lease, and to plan, construct, operate and maintain, or lease to others for operation and maintenance, bridges, tunnels, airports, wharves, docks, harbors, warehouses, grain elevators, commodity and other storage facilities, sewage disposal plants, *passenger transportation facilities,* and air, water, rail, motor vehicle and other terminal facilities." [3] (Emphasis ours.)

---

2. The consent of Congress to this compact was required by Article I, Section 10, Clause 3 of the Constitution of the United States, which provides in part:
"No state shall, without the consent of Congress * * * enter into any agreement or compact with another state * * *."
For insight as to the role of the interstate compact, see Petty v. Tennessee-Missouri Bridge Comm., 359 U.S. 275, 279, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), and Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 104, 58 S.Ct. 803, 82 L.Ed. 1202 (1938). The required consent reads:
"[T]he consent of Congress is hereby given to the entry, by the State of Missouri and by the State of Illinois, into the compact or agreement set forth above, and to said compact or agreement and to each and every term and provision thereof: *Provided,* That any obligations issued and outstanding, including the income derived therefrom, under the terms of the compact or agreement, and any amendments thereto, shall be subject to the tax laws of the United States: *And provided further, That nothing herein contained shall be construed to affect, impair, or diminish any right, power, or jurisdiction of the United States or of any court,* department, board, bureau, officer, or official of the United States, *in, over, or in regard to* the territory which is embraced in the district created by the aforesaid compact or agreement or any navigable waters, or *any commerce between the States* or with foreign countries, or any bridge, railroad, highway, pier, wharf, or other facility or improvement, or any other person, matter, or thing, forming the subject matter of the aforesaid compact or agreement; or otherwise affected by the terms thereof: *And provided further,* That no power or powers shall be exercised by the Bi-State Agency under that certain portion of article III of such compact which reads:
'8. To exercise such additional powers as shall be conferred on it by the legislature of either state concurred in by the legislature of the other or by act of Congress.'
unless and until such power or powers shall have been conferred upon the Bi-State Agency by the legislature of one of the States to the compact and concurred in by the legislature of the other and shall have been approved by an Act of Congress: *And provided further,* That the right to alter, amend, or repeal this resolution is hereby expressly reserved." (Emphasis ours.) Act of August 31, 1950, Pub.L. No. 81–743, 64 Stat. 568.

3. Congress approved the exercise of these additional powers in Pub.L. No. 86–303, § 2, 73 Stat. 582 by providing:
"The provisions of Public Law 743, Eighty-first Congress, approved August 31, 1950 (64 Stat. 568), shall apply to the additional powers approved under

There is no question that Bi-State operates as a nonprofit corporation in the public interest. Its properties have been ruled exempt from state taxation. Missouri Op.Atty.Gen. No. 218, State Tax Comm'n. (December 30, 1964).

The complaint alleges that Bi-State commenced operation of a public transit system on or about April 1, 1963; that it purchased most of the public service lines in the metropolitan area; that thereafter it instituted in both Missouri and Illinois a student pass plan, "the consequence of which was to exclude competition or prevent competition in the business of student bus transportation in the St. Louis metropolitan area." It is further asserted that in September 1963 Bi-State reinstated a $2.00 per week student bus pass which had previously been abandoned by St. Louis Park Serv. Co., its predecessor, because it was operated at a loss; that Bi-State has eliminated all charges for change of lines, zone fares and transfer charges; that the student rate is unreasonably low; that Bi-State has in addition acquired contracts for school bus service without competitive bidding or where competitive bids were invited without Bi-State having submitted the low bid; that by reason of these allegations plaintiff urges that Bi-State is guilty of destroying and eliminating competition and that plaintiff has been destroyed by the attempted monopolization of the school bus market, in violation of Section 2 of the Sherman Antitrust Act.

In the event that Bi-State were subject to the antitrust laws we would be required to review the basis of the district court's holding, i. e. that defendant is exempted from the antitrust law by § 5(11) of the Interstate Commerce Act. However, before a party can be said to be exempt from the operation of the antitrust laws under § 5(11) it is necessary to determine whether a state or an agency thereof is subject to regulation under the antitrust laws in the first instance.

As early as 1904, the Supreme Court, in dealing with pilotage services in and about the port of Galveston, Texas, observed:

"The contention that because the commissioned pilots have a monopoly of the business, and by combination among themselves exclude all others from rendering pilotage services, is also but a denial of the authority of the State to regulate, since if the State has the power to regulate, and in so doing to appoint and commission, those who are to perform pilotage services, it must follow that no monopoly or combination in a legal sense can arise from the fact that the duly authorized agents of the State are alone allowed to perform the duties devolving upon them by law." Olsen v. Smith, 195 U.S. 332, 344–345, 25 S.Ct. 52, 55, 49 L.Ed. 224 (1904).

In Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), the Supreme Court expanded this reasoning:

*"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.* The Act is applicable to 'persons' including corporations, § 7, 15 U.S.C.A., and it authorizes suits under it by persons and corporations. § 15. A state may maintain a suit for damages under it, State of Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346, but the United States may not, United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071—conclusions derived not from the literal meaning of the words 'person' and 'corporation' but from the purpose, the subject matter, the context and the legislative history of the statute.

"There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately en-

---

this joint resolution to the same extent as if such additional powers were con-

ferred under the provisions of the compact consented to in such public law."

acted as the Sherman Act declared that it prevented only 'business combinations.' 21 Cong.Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493, 60 S.Ct. 982, 983, 84 L.Ed. 1311, 128 A.L.R. 1044 and n. 15; United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 54–58 [31 S.Ct. 502, 55 L.Ed. 619]." (Emphasis ours.)

See E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1 Cir. 1966), cert. denied 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966). See also Eastern R. Presidents Conf. v. Noerr Motors, 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672 (5 Cir. 1968), cert. denied 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968); Bank of Utah v. Commercial Security Bank, 369 F.2d 19, 24 (10 Cir. 1966), cert. denied 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1967); Pennsylvania Water & Power Co. v. FPC, 89 U.S.App. D.C. 235, 193 F.2d 230, 235 (1951), aff'd 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042 (1952); Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299, 302–303 (D.Mass.1957), aff'd mem. 242 F.2d 758 (1 Cir. 1957), cert. denied 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957). Thus, it appears that the proposition is settled that the antitrust laws do not apply to state government or activities undertaken pursuant to legislative mandate.

The plaintiff urges, however, that bussing of school children is not a recognized governmental function, that it is proprietary in nature and therefore Bi-State should not enjoy sovereign immunity. Ladue relies upon authorities which recognize the distinction between governmental and proprietary activities in the context of tortious liability and taxation of proprietary interests. We think this approach misconceives the true issue before us. The matter is best stated in the language of Judge McEntee that "we do not reach any question of immunity, since there was no attempt on the part of Congress to impose liability [under the antitrust laws] in the first place." E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, supra, 362 F.2d at 56.

The fallacy of the proprietary argument can perhaps be best illustrated by Parden v. Terminal R. Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). In that case the State of Alabama operated a railroad in interstate commerce to service the Mobile docks. It performed this service for profit under statutory authority as though it were an ordinary common carrier. An employee of the railroad brought suit against it under the Federal Employers' Liability Act for personal injuries sustained in the course of employment. The railroad defended on the ground of sovereign immunity. The FELA provides that "every common carrier by railroad" is subject to the terms of the Act. 45 U.S.C.A. § 51. The Supreme Court held that the state was originally immune, but the operation of the railroad in interstate commerce constituted a waiver of such immunity. The Court said that Congress intended by the broad language to include states within the FELA, and that the state's immunity is secondary to Congress' power to regulate commerce.

The essential difference between this case and *Parden* lies in the fact that when the sovereign immunity of the state was waived the state became subject to liability under the FELA. In the instant case, even if we assume the sovereign immunity of Bi-State to be waived by the terms of the compact or by engaging in a proprietary action, Congress has not exercised its authority to impose liability since the antitrust laws

are not directed at governmental action. *Parker v. Brown, supra.*

In *Parden,* the Supreme Court relied upon the rationale in Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), where Congress attached the same conditions in approving that compact as they did here. The Supreme Court held that this constituted a waiver of the states' sovereign immunity to liability under the Jones Act. In *Petty,* the Supreme Court commented, "We assume *arguendo* that this suit must be considered as one against the States since this bi-state corporation is a joint or common agency of Tennessee and Missouri." 359 U.S. at 279, 79 S.Ct. at 789. The entire discussion in *Petty* then focuses on the loss of sovereign immunity of the agency by reason of the Congressional condition attached to the compact that the states' agency could sue or be sued.

As in *Petty,* we think it clear that the entry of the two states into the compact in the present case manifests a consent of the states that Bi-State be subject to the jurisdiction of federal authority governing "commerce between the States." State sovereignty is waived as to such rights belonging to the United States as Congress may exercise or which might accrue to third persons under federal laws affecting interstate commerce. However, since the Sherman Act does not operate against governmental activities, the right and remedy plaintiff seeks to invoke here is simply not available.

Cases dealing with private corporations seeking to avoid the application of the antitrust laws because of state or federal regulation are clearly distinguishable. See e. g., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1 Cir. 1970); Asheville Tobacco Bd. of Trade, Inc. v. FTC, 263 F.2d 502 (4 Cir. 1959); Travelers Ins. Co. v. Blue Cross of Western Penn., 298 F.Supp. 1109 (W.D.Pa.1969).

Plaintiff offers no argument that the bussing of school children, by charter service or otherwise, is not within the scope of Bi-State's legislative authority to "operate * * * passenger transportation facilities." We are not faced with an "ultra vires" argument that the regulated body is operating beyond the scope of its authority. See e. g., Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

Bi-State's entrance into the public transportation business in the St. Louis metropolitan district was necessitated by the deteriorating condition of mass transportation similarly experienced by major urban areas throughout the country. As the report of the Interstate Commerce Commission in the *Bi-State* acquisitions case points out:

"St. Louis was experiencing problems similar to those of other major metropolitan centers resulting from increasing use of automobiles for commutation, inadequacy of existing transit facilities, numerous competing companies rendering wasteful duplicate service, and total dependence on surface transportation. Also, the situation was complicated by the presence of the Mississippi River cutting through the center of the metropolitan area and requiring traffic to flow over the several existing bridges. [93 M.C.C. at 582.]

* * * * * *

"The proposed unified transit system is the first and most important step to be taken in providing longterm improvement of the transportation situation in the St. Louis area. The inauguration of an area-wide zone fare structure with transfer privileges is contemplated along with the establishment of through services, both local and express, in lieu of that provided jointly by different carriers with limited local routes. Also, the transaction has been designed to eliminate uneconomical duplicate services, both in Missouri and Illinois, to improve routing and terminal facilities in downtown St. Louis, to replace the remaining street car operations with

bus service, and generally to bring about improvements which are necessary to halt the decline in the use of mass transportation service and reduce future traffic congestion in St. Louis and numerous adjacent communities." *Id.* at 592.

When a state determines that it is in the public interest to operate a public transportation system as a monopoly, or when two states enter into a congressionally approved compact to do so, the antitrust laws do not apply, whether the operation is labeled proprietary or governmental. The fact that the effect of the compact gives Bi-State a monopoly and that competitive interests of private concerns are harmed does not violate the Sherman Act. We deem it well settled that when a state announces a public policy against free competition in an industry essential to it, state control and regulation of that industry, even to the extent of eliminating competition, is permissible.

Mr. Justice Roberts made this much clear in Nebbia v. New York, 291 U.S. 502, 529–530, 538, 54 S.Ct. 505, 512–513, 516, 78 L.Ed. 940 (1934):

"The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld. On the other hand, where the policy of the state dictated that a monopoly should be granted, statutes having that effect have been held inoffensive to the constitutional guarantees. Moreover, the state or a municipality may itself enter into business in competition with private proprietors, and thus effectively although indirectly control the prices charged by them.

\* \* \* \* \* \*

"If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public."

Here, Bi-State is a body politic created by the legislatures of Missouri and Illinois. It is acting under legislative authorization to operate passenger transportation facilities. This authorization was granted pursuant to a legislative policy that the public interest would best be served by a unified public transportation system. Under existing law this activity is not subject to the antitrust laws.

Judgment affirmed.