REDBIRD ENGINEERING SALES, INC., Plaintiff–Appellant,

v.

BI–STATE DEVELOPMENT AGENCY OF MISSOURI–ILLINOIS METROPOLITAN DISTRICT, et al., Defendants–Respondents.

No. 57815.

Missouri Court of Appeals, Eastern District, Division Five.

Feb. 19, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 26, 1991.

Application to Transfer Denied May 3, 1991.

William Sitzer, Dubail Judge, a Professional Corp., St. Louis, for plaintiff-appellant.

Robert E. McWilliams, Jr., Lashly & Baer, P.C., St. Louis, for defendants-respondents.

ROBERT G. BRADY, Senior Judge.

Redbird Engineering Sales, Inc., ("Redbird") appeals from the judgment entered in favor of respondents Bi–State Development Agency of Missouri–Illinois Metropolitan District ("Bi–State") and its commissioners in a bench-tried case upon a joint stipulation of uncontested facts and agreed-upon exhibits. We affirm in part and reverse and remand in part.

Bi–State ·contracted with River City Steel, Inc. ("River City") for River City to provide certain steel products for use in the construction of the New DeBaliviere Station Garage ("the project"),[1] a public transportation facility in the City of St. Louis. River City had an independent agreement

---

1. The parties and the trial court use the terms "New DeBaliviere Station Garage" and "New DeBaliviere Station Project" interchangeably, sometimes dropping the word "New."

with Redbird whereby certain materials for the project were to be supplied by Redbird who was to be paid by River City. Redbird provided those materials to River City and they were used in the construction of the Bi–State facility. River City failed to pay Redbird the full amount owed for the materials supplied.

River City subsequently filed for bankruptcy. It is not necessary to detail those proceedings. River City and Redbird eventually entered into a settlement in the bankruptcy court. Bi–State deposited money in the bankruptcy court representing its unpaid contract balance owed River City. Thus, Bi–State has paid the entire amount it owed River City under the purchase order contract.

Following its unsuccessful demand for payment, Redbird filed this separate circuit court action seeking imposition of a mechanics' lien on the property owned by Bi–State. Respondents Bi–State and its commissioners were defendants, as well as River City and several others who are not parties to this appeal. After the trial court dismissed that petition, Redbird filed an amended petition: (1) to impose a lien against the funds Bi–State had deposited with the bankruptcy court; (2) for damages for Bi–State's failure to require River City to furnish a contractor's bond under Section 107.170, RSMo (1986); and (3) for damages for Bi–State's alleged negligent disbursement of contract funds.

The count for a lien on funds was resolved pursuant to the bankruptcy settlement, while the count for negligent disbursement of funds was dismissed by the trial court. The trial court disposed of the remaining count for the alleged failure of Bi–State's commissioners to require a contractor's bond by River City after a bench-tried case and ruled against Redbird. Redbird raises two issues on appeal: (1) whether the New DeBaliviere Station Garage owned by Bi–State is public property exempt from mechanics' liens, seizure or sale; and (2) whether the Bi–State Commissioners are personally liable to Redbird for their failure to require River City to furnish a bond pursuant to Section 107.170, RSMo (1986). We address each point in turn.

Mechanics' liens, as distinguished from common law artisans' liens, are purely creatures of statute. *Davidson v. Fisher*, 258 S.W.2d 297, 301 (Mo.App.1953). The statutory authority permitting a mechanics' lien in connection with the construction of improvements upon real estate in Missouri is governed by Section 429.010, RSMo (1986) (since amended by S.B. 808 and 672, effective August 28, 1990. *See* 1990 Mo. Legis. Service 937 (Vernon)). Section 429.-010 provides in pertinent part that "[a]ny person who shall ... furnish any material ... under or by virtue of any contract with the owner.... or his agent, trustee, contractor or subcontractor ... shall have for his materials furnished ... a lien...." Provisions are made for execution in Section 429.250.[2]

■ At first blush, Redbird would seem to come within the ambit of the mechanics' lien statute. However, by the great weight of authority, a public building, lot or other public property owned by a traditional governmental body such as a state, county, city or school district and devoted to public use is not subject to a mechanics' lien. *See* 57 C.J.S. *Mechanics' Liens*, Section 10 (1948); 53 Am.Jur.2d *Mechanics' Liens*, Section 29 (1970); *see also Annot.*, 51 A.L.R.3d 657 (1973) (superseding *Annot.*, 26 A.L.R. 326 (1923)). Missouri courts have specifically so ruled. *See, e.g., Security State Bank v. Dent County*, 345 Mo. 1050, 137 S.W.2d 960, 961 (1940); *Union Reddi-Mix Co. v. Specialty Concrete Contractor*, 476 S.W.2d 160, 162 (Mo.App.1972).

As this Court stated in *Union Reddi-Mix*, "[e]ven independently of statutory exemption and as a general proposition, property held by a municipal corporation which is held in trust for the benefit of the public and used for public purposes is exempt from execution." 476 S.W.2d at 162.

■ While we are unable to find a Missouri decision dealing with whether a mechanics' lien can be imposed upon buildings

---

**2.** All further statutory references are to RSMo (1986) unless otherwise noted.

and property owned by a *quasi-public* corporation and used for the benefit of the public, the general rule is that the property of a quasi-public corporation which is affected with a public use is not subject to a mechanics' lien. 57 C.J.S. *Mechanics' Liens*, Section 11; 53 Am.Jur.2d *Mechanics' Liens*, Section 34. For example, in *Vulcanite Paving Co. v. Philadelphia Rapid Transit Co.*, 220 Pa. 603, 69 A. 1117 (1908), the Supreme Court of Pennsylvania held as follows:

> The decisions of our courts, as well as the statutes relating to the subject, are based on a policy of the law intended to keep intact the property belonging to and essential in the operation of a public service corporation, so that its creditors may not seize and sell the same piecemeal, and by thus disabling it defeat the purpose for which it was created by rendering it unable to perform its duties to the public.

69 A. at 1117.

■ There is no question that Bi–State operates as a nonprofit corporation in the public interest. *Ladue Local Lines, Inc. v. Bi–State Development Agency of the Missouri–Illinois Metropolitan District*, 433 F.2d 131, 134 (8th Cir.1970). Respondents so admit in their brief. The rationale for the exception from lien imposition of property held for public use by a quasi-public corporation is uniformly stated by the courts to be the same as that given when the property is held by a city, a county, a school district or some other of the traditional governmental entities. We believe that rationale to be sound in both instances. We therefore adopt the general rule and hold that the exception barring the imposition of mechanics' liens on property of public corporations may also encompass that of quasi-public corporations.

■ But not all property held by Bi–State or by any quasi-public body is automatically sheltered from lien imposition. Only such property held by a quasi-public corporation for the benefit of the public which can be determined to be reasonably

necessary for public use is exempt. "The question as to whether property is reasonably necessary for public use must ultimately be determined judicially." *Burgess v. Kansas City*, 259 S.W.2d 702, 704 (Mo. App.1953) (quoting 21 Am.Jur. Section 457, p. 230). We have no difficulty in concluding that the Bi–State project involves property reasonably necessary for public use rendering it exempt from mechanics' liens.

Bi–State was created in 1949 by virtue of an interstate compact between the states of Missouri and Illinois. Section 70.370, RSMo (1986) sets forth the compact.[3] Article III thereof created "the Bi–State Development Agency of the Missouri–Illinois Metropolitan District," "a body corporate and politic" and specifically authorized the agency, among other powers, to "plan, construct, maintain, own and operate ... terminal facilities." *Id.* Article VI provides that "[t]he bi-state agency ... is vested with all necessary and appropriate powers not inconsistent with the constitution or the laws of the United States or of either state...." *Id.* Section 70.373(1) grants additional powers to the agency, including the power to "plan, construct, operate and maintain ... passenger transportation facilities, ... and other terminal or parking facilities."

The early case of *Ladue Local Lines, Inc.* comments that "Bi–State's entrance into the public transportation business in the St. Louis metropolitan district was necessitated by the deteriorating condition of mass transportation similarly experienced by major urban areas throughout the country." 433 F.2d at 136. The court in *Ladue Local Lines, Inc.* quoted with approval the findings of the Interstate Commerce Commission in Bi–State Development Agency—Pur.—Vandalia Bus Line, 93 M.C.C. 579, 582 (1964), that Bi–State's activity with regard to transportation was "designed to eliminate uneconomical duplicate services, ... to improve routing and terminal facilities in downtown St. Louis, ... and generally to bring about improvements which are necessary to halt the decline in the use of

---

**3.** *See* Ill.Ann.Stat. Ch. 127, ¶¶ 63r–1 through 63s–9 (Smith–Hurd 1990) for the Illinois counterpart authorizing the creation of the Bi–State Agency.

mass transportation service...." *Ladue Local Lines, Inc.*, 433 F.2d at 136–37.

■ Redbird does not dispute Bi–State's assertion in its brief that its buses are kept and repaired in the New Devaliviere Garage. Keeping in mind Bi–State's duties with regard to public transportation set out in the authorities cited earlier herein and that automotive vehicles of the type and kind used in public transportation often require repair, we hold the project was "reasonably necessary for public use" under the direction of *Burgess.* It follows that the Bi–State project is not subject to the imposition of a mechanics' lien. The trial court did not err in granting Bi–State's motion to dismiss Redbird's mechanics' lien claim. Redbird's first point is denied.

Redbird's second point challenges the trial court's ruling in favor of Bi–State on Count III of Redbird's first amended petition. Count III alleged that Section 107.170 applied to Bi–State's commissioners; that they failed to comply with the statute by not requiring River City provide a bond on the project; and, therefore, that the commissioners were personally liable to Redbird for losses it sustained from River City's failure to pay it.

In its pertinent parts Section 107.170 provides:

> It is hereby made the duty of all officials, boards, commissions, commissioners, or agents of the state, or of any county, city, town, township, school, or road district in this state, in making contracts for public works of any kind to be performed for the state, or for such county, city, town, township, school or road district, to require every contractor for such work to furnish to the state, or to such county, city, town, township, school or road district, as the case may be, a bond with good and sufficient sureties, in an amount fixed by said officials, boards, commissions, commissioners, or agents of the state, or of such county, city, town, township, school or road district....

The trial court expressly ruled that Section 107.170 does not apply to Bi–State or its commissioners because: (1) "[n]either Bi–State nor its Commissioners are 'officials, boards, commissions, commissioners, or agents of the state, or of any county, city, town, township, school or road district in this state' "; (2) the project "did not involve a contract for public work to be performed for the state", or for any other entity named in Section 107.170; and (3) "by virtue of its legal status as a bi-state body, Bi–State is not subject to, nor required to comply with, any burden, responsibility, dictate or obligation unilaterally imposed by either the State of Missouri or the State of Illinois without the concurrence or approval of the other state," and "[t]o require Bi–State to comply with the requirements of Section 107.170 Mo.Rev. Stat. would unilaterally impose an impermissible burden upon Bi–State and its Commissioners."

We first discuss the trial court's ruling that neither Bi–State nor its Commissioners are "officials, boards, commissions, commissioners, or agents of the state or of any county, city, town, township, school or road district in this state" within Section 107.170. Before we address this, the perimeters of our inquiry should be clearly understood. In their briefs both parties have repeatedly cited the results of respondents' previous appearances in the courts of this state, none of which involved Section 107.170. Each urges that one or more of the earlier decisions determines once and for all exactly what Bi–State is or is not and thus rules this case. Not so. The Bi–State entity is not neatly pigeonholed. The Supreme Court of Missouri has recognized that the context in which respondents' actions are challenged can make a difference in how Bi–State is characterized. *See, e.g., Bi–State Development Agency v. Director of Revenue,* 781 S.W.2d 80, 84 (Mo.1989). Thus, it is not necessary for us here to attempt an all-encompassing definition of Bi–State when our own Supreme Court has eschewed that path.

The dispositive issue in this case is extremely narrow. It is whether respondents, in undertaking this mass transportation project, acted as "agents of the state"

within the scope of Section 107.170. We do not pass upon the relationship between respondents and the State of Missouri in any of the other activities and projects in which respondents may engage.

Few, if any, rules in our system of jurisprudence are more solidly entrenched and universally agreed upon then those regarding statutory construction. They are well-known and accepted and require no reiteration here. Furthermore, the parties agree, and we concur, that Section 107.170 is unambiguous.

■ In its normal and usual meaning, the word "agent" refers to one who consents with another, the *principal*, for the agent to act on the principal's behalf and to be subject to the principal's control. *Tom Lange Co. v. Cleaning by House Beautiful*, 793 S.W.2d 869, 871 (Mo.App.1990); Restatement (Second) of Agency Section 1 (1957). An "agent" is "[o]ne who acts for or in place of another by authority from him; a substitute, a deputy, appointed by a principal with power to do the things which the principal may do." *Black's Law Dictionary*, 59 (5th ed. 1979).

■ We cannot endow "agent" with a meaning other than that expressed above. Indeed, we are satisfied that the normal and usual meaning ascribed to the word "agent" accurately describes the relationship between respondents and the State of Missouri, their principal. Their responsibility in contracting for this project was specifically entrusted to them by Missouri under the language of the Compact. The Compact refers to "agency" or "bi-state agency" throughout the statute. While the State of Missouri remains the ultimate arbiter in the management of public mass transportation for the health, safety and welfare of its citizens, Missouri consented to having its authority exercised by respondents with its creation of the Bi–State Agency. We cannot discard the word "agency" arbitrarily by assuming it was inappropriately chosen by the legislature. That can be done only when a word or phrase conflicts with the legislative purpose and intent. The word "agent[s]" and the phrase "agents of the state" do not so conflict. In fact, their use furthered the legislative intent and purpose of extending the coverage of Section 107.170 to all those who otherwise do not have lien protection. Failure to give the normal and usual meaning to the word and phrase would mandate exemption from Section 107.170 of all contracts let by the state through its agents. This reading would contract, not expand, the coverage of Section 107.170, defeating both the intent and purpose of the statute as held in *Maurer v. Werner*, 748 S.W.2d at 841, and *Finch Equipment Corp. v. Frieden*, 901 F.2d at 667. Such a ruling would be incompatible with those cases, and a myriad of others, espousing liberality in our dealing with Section 107.170.

The conclusion is inescapable. The legislature knew full well the meaning of the word "agent" and used it deliberately not just once, but twice, in order to further its intent to close every loophole and ensure that Section 107.170 applied to contracts made by agents of the state. We hold that respondents were agents of their principal, the State of Missouri, for the project, insofar as the application of Section 107.170 is concerned.

■ Respondents then argue that the duality of their activity for two principals prevents them from being an agent of Missouri subject to the provisions of Section 107.170. Again they are mistaken. That respondents have not one, but two principals, does not diminish their agency relationship with either Missouri or Illinois. An agent who has two principals still has the duty to act with fairness to each principal just as the agent has in dealing with a single principal on his own account. *Harry M. Fine Realty Co. v. Stiers*, 326 S.W.2d 392, 398 (Mo.App.1959); Restatement (Second) of Agency Section 392. So, too, with Bi–State. Even as a single, quasi-public corporate instrumentality of both Missouri and Illinois, Bi–State sheds none of its responsibility to the State of Missouri as its agent. It remains accountable to the mandate of the Missouri legislature and our courts. *See, e.g., Bi–State Development Agency of the Missouri–Illinois Metropolitan District v. Director of Revenue*, 781

S.W.2d 80, 83–84 (Mo. banc 1989); *State ex rel. Trimble v. Ryan,* 745 S.W.2d 672 (Mo. banc 1988).

■ We turn next to the trial court's ruling that the project was not a public work to be performed for the state. We hold it was. Earlier herein we concluded the project was reasonably necessary for public use so as to render it sheltered from lien imposition. In doing so, we relied in part on the provisions of the compact specifically authorizing the agency to plan, construct, and maintain terminal facilities. We also referred to that portion of Section 70.373(1) granting additional powers to the agency including the construction of terminal or parking facilities. The project was a work on a property within the Bi–State Metropolitan District insuring service to the public by the care and repair of mass transportation vehicles. In contracting for the work, it was obviously the judgment of the commissioners that such a building would help alleviate mass transportation problems the public was experiencing within the district. Under Article III of the Compact and Section 70.373(1) they not only had the right to make that judgment but were specifically charged with that responsibility. *Ladue Local Lines, Inc.,* 433 F.2d at 136–137. It does not stretch the imagination to see the public benefit that could result from the project's contribution to the orderly and continued flow of public transportation throughout the district. When respondents, as "agents of the state" authorized this project they effectively rendered it a public work to be performed for the state. That the project was for the public benefit of the people of Illinois as well as those of Missouri does not foreclose our finding the project was a public work within the purview of Section 107.170.

■ Our final scrutiny of the trial court's judgment focuses on its ruling that, by requiring respondents' actions to conform to Section 107.170, Missouri unilaterally foists an impermissible burden upon respondents. It is true that one party to an interstate compact may not enact legislation which would impose burdens upon the compact absent the concurrence of oth-

er signatories. *Kansas City Area Transportation Authority v. State of Missouri,* 640 F.2d 173, 174 (8th Cir.1981). However, the corollary of that proposition is that the agency may be made subject to complimentary or parallel state legislation. *Eastern Paralyzed Veterans Association v. City of Camden,* 111 N.J. 389, 545 A.2d 127, 133 (1988).

■ This court has previously examined Section 107.170 and has held its purpose is to protect those providing labor and materials to public works contractors in lieu of mechanics' liens, which are inapplicable to public property. *Maurer v. Werner,* 748 S.W.2d 839, 841 (Mo.App.1988). The Missouri legislature enacted the Public Works Bond Statute for the additional purposes of facilitating the construction of public work and preventing unjust enrichment of those who receive a material benefit. *Finch Equipment Corp. v. Frieden,* 901 F.2d 665, 667 (8th Cir.1990).

Illinois has a complementary statute, strikingly similar to our Section 107.170, also requiring the bonding of public works contractors. Entitled "Contracts for Public Works," Ill.Ann.Stat. Ch. 29, ¶ 15 (Smith-Hurd 1990) provides in pertinent part:

1. All officials, boards, commissions or agents of this state, or of any political subdivision thereof in making contracts for public work of any kind to be performed for the state, or a political subdivision thereof shall require every contractor for such work to furnish, supply and deliver a bond to the state, or to the political subdivision thereof entering into such contract, as the case may be, with good and sufficient sureties. The amount of such bond shall be fixed by such officials, boards, commissions, commissioners or agents....

Illinois cases analyzing this statutory counterpart to Missouri's Public Works Bond Statute echo the language of Missouri decisions that the statutory bond requirement for public works should be construed liberally in order to effectuate the remedial legislative purpose of protecting subcontractors and materialmen for whom no right of mechanics' lien exists against a

public body. *See, e.g. Chicago Housing Authority ex rel. General Bronze Corp. v. U.S. Fidelity and Guaranty Co.*, 49 Ill. App.2d 407, 199 N.E.2d 217, 219 (1964).

 Since the legislation of both states is for all intents and purposes identical insofar as our inquiry is concerned, and the courts of each state are in accord as to the construction of their respective acts, we disagree with the trial court's final conclusion that any imposition of liability for the commissioners' failure to require the statutory bond on this project would have imposed an impermissible, unilateral burden.

We conclude that the trial court erred as a matter of law in finding in favor of respondents on this count for failure to require a bond under Section 107.170. The trial court's order that no mechanics' lien be imposed was proper.

The judgment is affirmed in part and reversed and remanded in part.

SIMON, CRIST, JJ., concur.