45 F.Supp.2d 685 (1999)
UNION PACIFIC RAILROAD COMPANY, Plaintiff,
v.
MIDLAND EQUITIES INCORPORATED, St. Louis Marketplace Limited Partnership, and Thomas A. Villa, et al., Individually, and in their Official Capacities as Members of the Board of Aldermen of the City of St. Louis, Missouri, and Vincent C. Schoemehl, Jr., Individually, and in his Official Capacity as Mayor of the City of St. Louis, Missouri, and Virvus Jones, Individually, and in his Official Capacity as Comptroller of the City of St. Louis, Defendants.
No. 4: 96 CV 14 DDN.
United States District Court, E.D. Missouri, Eastern Division.
March 29, 1999.
*686 *687 Robert L. Jackstadt, Jeffrey J. Kalinowski, Partner, B. Michelle Ward, Blackwell and Sanders, St. Louis, MO, for Missouri Pacific Railroad Company aka Missouri Pacific Railroad Company, plaintiff.
David T. Butsch, Associate, Martin M. Green, Partner, Joe D. Jacobson, Green and Schaaf, St. Louis, MO, for St. Louis Marketplace Limited Partnership, defendant.
Steven R. Wild, Thompson Coburn, St. Louis, MO, Patricia A. Hageman, St. Louis City Counselor Office, St. Louis, MO, for Thomas A. Villa, Michael Sheehan, Jack Garvey, Claude Taylor, Geraldine Osborn, Irene J. Smith, Nancy S. Weber, Freeman *688 Bosley, Sr., Bertha Mitchell, Mary Ross, Marit Clark, Phyllis Young, Stephen J. Conway, Martie J. Aboussie, Craig Schmid, Daniel Gruen, Fred Heitert, Alfred Wessels, Jr., Stephen Gregali, Marge Vining, James Shrewsberry, Joseph D. Roddy, Terry Kennedy, Velma Bailey, Sharon Tyus, Bennice Jones King, Kenneth Jones, Jim Sonderman, Robert Ruggeri, Paul Beckerle, Irving C. Clay, Gregory Carter, Daniel Mcguire, Virvus Jones, defendants.
Steven R. Wild, Elkin L. Kistner, Schlueter and Haywood, St. Louis, MO, Patricia A. Hageman, Green and Schaaf, St. Louis, MO, for Vincent C. Schoemehl, Jr., defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the Court, following a non-jury trial, for the rendering of findings of fact and conclusions of law by the Court. The parties have consented to the exercise of plenary jurisdiction over the action by a United States Magistrate Judge under 28 U.S.C. § 636(c).
After commencing this action, plaintiff Missouri Pacific Railroad Company (Missouri Pacific) merged into Union Pacific Railroad Company (Union Pacific) which became the real party plaintiff in interest. Union Pacific has prosecuted this action against Midland Equities Incorporated (Midland or Midland Equities), St. Louis Marketplace Limited Partnership (SLMLP), and several individuals in their individual capacities, and in their official capacities as mayor, comptroller, and aldermen of the City of St. Louis (City defendants).
Union Pacific is seeking damages for monies owed for work Missouri Pacific performed in relocating railroad tracks in connection with public improvements for the construction of the St. Louis Market-place Shopping Center (shopping center project) in the City of St. Louis. Union Pacific is also seeking to recover the difference in values of railroad track rights-of-way transferred in connection with the shopping center development.
The following claims by Union Pacific remain before the Court for determination:[1]
(1) Count II against SLMLP for quantum meruit; and
(2) Count III against the City defendants, for the alleged violation of Missouri Revised Statute § 107.070, because a labor and a material payment bond had not been obtained to secure payment to Missouri Pacific for its work on the project.
The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, by reason of the diversity of the parties' citizenship and the amount in controversy. The Court hereby makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).

The parties.
Prior to its merger into Union Pacific, and at the time it commenced this action, Missouri Pacific was a corporation organized and existing under the laws of Delaware with its principal place of business in Omaha, Nebraska.
Defendant Midland Equities, Inc., is a corporation organized and existing under the laws of Missouri with its principal place of business in St. Louis, Missouri.
Defendant St. Louis Marketplace Limited Partnership (SLMLP) is a limited partnership organized and existing under the laws of Missouri with its principal place of business in Missouri.
The individual defendants are citizens of Missouri and held the respective positions of Mayor of the City of St. Louis, Comptroller of the City of St. Louis, and members *689 of the Board of Aldermen of the City of St. Louis. The individual defendants are sued in their official and individual capacities.

The Redevelopment Plan.
In 1990, the City of St. Louis and certain interested parties determined to improve the economy of the City by developing the St. Louis Marketplace shopping center. The shopping center project was to be located along Manchester Avenue near the abandoned Scullin Steel facility in the southwest part of the City and was made possible by the Tax Increment Blighting Analysis and Redevelopment Plan for the Scullin Redevelopment Project Area (Redevelopment Plan or Plan), dated March 30, 1990. (Pl.Exh.1).[2] The Plan was produced by the City and its purpose included permitting the City to use tax increment financing (TIF) for the project. (Joint Stipulation, ¶ 15).
On July 20, 1990, by three City ordinances, Nos. 62043, 62044, and 62045, respectively, the City's Board of Aldermen and Mayor approved the Redevelopment Plan, designated the Scullin Redevelopment Project Area as a redevelopment project area, and adopted tax increment financing for the redevelopment project area. (Pl.Exhs. 1, 2, 3, and 4). The shopping center was to be a 461,000 square foot retail facility which ultimately was built and became known as the St. Louis Marketplace shopping center.
Each of the three City ordinances incorporated the Redevelopment Plan by reference. Ordinances Nos. 62044 and 62045 each also provided that
it is for the benefit of the City and its citizens and residents that the City proceed to implement the actions permitted by the [Missouri state Real Property Tax Increment Allocation Redevelopment] Act in connection with the Plan, including but not limited to establishing the procedures required to finance the public improvements projects and associated administrative costs (the "Projects") contemplated by and described in the Plan, and the acquisition by negotiation or eminent domain of those properties required for the implementation of the Plan.
(Pl.Exhs. 3 and 4, at 1). The Plan provided that the City, acting primarily through its Economic Development Corporation, would administer the Plan and carry out the overall daily operations of project management and implementation. (Pl.Exh. 1, at 26).
Originally, the Plan contemplated an expenditure of total development costs of $53,312,932.00. (Joint Stipulation, ¶ 10). The development costs were divided between private development costs of $36,312,932.00 and public development costs of $17,000,000.00. (Id.) The budget for the public development costs was later reduced to $15,000,000.00. (Joint Stipulation, ¶ 11). The public projects and the related development costs were funded through the issuance by the City of TIF bonds.
The developer for the St. Louis Marketplace project was the combination of Midland Equities and SLMLP. Midland Equities is and was the general partner of SLMLP. SLMLP is the general partner of the current owner of the shopping center property, Manchester-Ecoff Limited Partnership. The Redevelopment Plan was implemented and governed by two agreements, the Redevelopment Contract and the Public Improvements Agreement.

The Redevelopment Contract.
On June 1, 1991, the Redevelopment Contract, Plaintiff's Exhibit 5, was entered by the City of St. Louis, Midland Equities, and SLMLP. The Redevelopment Contract identified defendants Midland Equities and SLMLP collectively as the "Developer."
*690 The preamble of the Redevelopment Contract describes the purposes of the development activities:
WHEREAS, the City proposes to develop, in cooperation with the Developer, within the Area, certain Public Redevelopment Project Activities as described in the Plan and as further described herein (the "Public Projects") which will serve a public purpose and which are necessary to reduce or eliminate conditions that qualify the Area as a "blighted area" under the Real Property Tax Increment Allocation Redevelopment Act, Sections 99.800 through 99.865 of the Revised Statutes of Missouri (the "Act") and which are necessary to foster private development and redevelopment within the Area; and
WHEREAS, the City proposes to finance a portion of the costs to be incurred in connection with the Public Projects by utilizing tax increment financing in accordance with the Act, and has established the Scullin Redevelopment Project Area Tax Increment Financing District and authorized the issuance and sale of up to $15,000,000 in tax increment revenue bonds (the "Bonds"), the proceeds of which are to be used to pay for a portion of the costs of the Public Projects and related administrative costs of the City.
(Pl.Exh. 5, at 1).
The Redevelopment Contract defined the obligations of the City, Midland, and SLMLP with respect to both the private and public projects. The public improvement projects included the widening of Manchester Avenue; the relocation of two Missouri Pacific mainline railroad tracks, from a right-of-way parallel to and adjacent to Manchester Avenue in the shopping center development area, to a location south of the shopping center and away from Manchester Avenue; the realignment of a nearby Missouri Pacific railroad bridge; and the purchase of some 45 private residences where the Missouri Pacific railroad tracks would be relocated.
The Redevelopment Contract provided that the relocation of the railroad track and the construction of the relocated track facilities, identified as the "Substitute Railroad Facility,"[3] and all related work, was the responsibility of the developer.
The Redevelopment Contract required the acquisition of a labor and material payment bond:
The Developer shall before the commencement of any work in connection with the Substitute Railroad Facility tender for approval to the City proof of ... performance, labor and material payment bonds as are acceptable to and enforceable by the City with respect to the Substitute Railroad Facility ..., in all cases in such amounts and issued or made by such companies or sureties and in such forms as are acceptable to the City. Any such bond shall name the City as an obligee. Copies of certificates of such insurance or bonds shall be delivered to the City.
(Pl.Exh. 5, at 8-9, ¶ 1E(ix)). The provisions of the Redevelopment Contract were incorporated into Ordinance No. 62044 by reference. (Pl.Exh. 3, at 2).

The Public Improvements Agreement.
The second of the agreements that implemented the Redevelopment Plan was the Public Improvements Agreement, Plaintiff's Exhibit 6, which was entered into by the City, Midland, and Missouri Pacific, also on June 1, 1991. Midland was identified in this agreement as the "Developer." *691 The preamble to the Public Improvements Agreement specifically provides:
WHEREAS, certain parcels of real estate more particularly described on Exhibit A (the "Existing Right-of-Way") and Exhibit A-1 (the "Fee Parcel"), attached hereto are owned by the Railroad or if applicable, controlled by the Railroad pursuant to an easement interest therein, and scheduled for acquisition and redevelopment by the City as part of those public improvement projects; and
WHEREAS, the City has determined it must acquire the Existing Right-of-Way and the Fee Parcel for the purpose of constructing certain roadway improvements, including, but not limited to road surfaces, medians, sidewalks, curbing, lighting and landscaping; and
WHEREAS, the City has determined that acquisition of the Existing Right-of-Way and Fee Parcel and construction of such road are in the best interest of all of the citizens of the City....
(Pl.Exh. 6, at 1).
The Public Improvements Agreement defined the obligations of these parties regarding the Missouri Pacific railroad track relocation. Midland agreed to provide the engineering services to design the Substitute Railroad Facility and to construct it on the relocated right-of-way, based upon Missouri Pacific's published engineering guidelines. (Id. at ¶ 2.2).
Missouri Pacific agreed by the Public Improvements Agreement to provide the engineering services, to review and approve the design of the Substituted Railroad Facility, and to provide
all the work and equipment reasonably required to design and construct the railroad signal facilities, to connect the new track with the existing track, to protect, utilizing flagmen, or other means the ongoing rail operations during the construction of the Substitute Railroad Facility and to inspect and approve construction of the Substitute Railroad Facility (collectively, "the Railroad Work"). The Developer shall reimburse the Railroad for the full cost and expense of said Railroad Work in accordance with the schedule set forth in Exhibit G attached hereto.
(Id. at ¶ 2.5). Midland agreed to pay Missouri Pacific all reasonable costs it incurred in connection with relocating its tracks. (Id. at ¶ 2.5; Joint Stipulation, ¶ 18).
Missouri Pacific agreed to the necessary exchange-transfer of ownership of the rights-of-way. (Pl.Exh. 6, at 7, ¶ 3.5). Before Missouri Pacific entered into this agreement, the City suggested that the original right-of-way track property could be acquired by eminent domain. (Pl. Exh.12).
The City agreed to pay Midland a purchase price of $9,237,813.81 for the existing right-of-way on which Missouri Pacific's railroad tracks were situated and from which they would be moved. This purchase price was to be paid over time by means of advances of TIF bond sales proceeds. Any development costs exceeding $9,237,813.81 would be borne by Midland. Ultimately, the City of St. Louis paid Midland Equities more than $9,237,813.81 out of advances of TIF bond sale proceeds.
The Public Improvements Agreement also provided that Midland would pay Missouri Pacific $143,040.00 as compensation for the difference in value between the original railroad track right-of-way property which was to be transferred to Midland in exchange for the newly acquired right-of-way property. (Joint Stipulation, at ¶ 20).

The public project.
The development and building of the St. Louis Marketplace shopping center involved private and public development projects. This judicial action concerns the public projects, which required the widening of Manchester Avenue on the north side of the shopping center. The widening *692 of Manchester Avenue and the construction of the shopping center required the acquisition of the original railroad track right-of-way which ran parallel to Manchester Avenue on the south and the relocation of the Missouri Pacific railroad tracks to the newly acquired right-of-way.
The public improvements were funded by the TIF bond sales proceeds and $1.8 million contributed by Midland Equities from a construction loan. During the course of construction of the public improvements, Midland submitted monthly draw requests to the City's Board of Public Service. After approval of the draw requests for expenditures, the City funded the public improvement account in the respective amounts and directed its escrow agent, Mark Twain Bank, to make the approved payments. Missouri Pacific submitted its bills and invoices directly to Midland. Midland relied upon funds from the public improvement account to pay Missouri Pacific. City approval for the expenditures was necessary for Missouri Pacific to be paid for its work.

Missouri Pacific's work.
As set forth above, Midland had the contractual responsibility for providing the engineering plans for the relocation of the railroad tracks. Midland subcontracted with Design Nine, Inc., to provide the plans and profiles for the relocation of the tracks. Midland also hired McCarthy Brothers Company to construct the railroad facility. Missouri Pacific, from time to time, required changes in the plans to meet its standards.
The railroad track relocation occurred over a tract of land approximately one mile in length. Because of the weight of the trains that would use the relocated track, the land topography of the new right-of-way required structural enhancements not used in the original tracks.
The old track contained curves, old crossings, and old switches. These items were considered potential safety hazards and were replaced in the relocated tracks with safer appliances and devices. The replacement of the old crossings and switches was a benefit to Missouri Pacific, the City, the adjacent land users, including the Shopping Center project, and its developers, including SLMLP.
The new, relocated eastbound and westbound main tracks were located on different elevations. At the crossover connections one or the other main tracks had to be elevated so that the crossovers could be located on a level surface. This was necessary for the proper and safe operation of the devices and the trains. In the relocated tracks Missouri Pacific also installed concrete ties, to replace the wooden ones. The relocated tracks were secured with clips, not the original spikes which had been used with wooden ties. The track relocation work also required the hauling away of rubble and its replacement with suitable base rock. All of this work benefitted all parties, including SLMLP.

The escrow closing transaction.
On May 26, 1992, the project development escrow was closed. Before that date, the title owner of the relocated track right-of-way property was Midland Equities and the title owner of the original track right-of-way property was Missouri Pacific. On May 26, 1992, the railroad track relocation work was substantially, but not entirely, completed by Missouri Pacific. It conveyed the existing, original track, right-of-way property to Midland in exchange for the relocated, new track, right-of-way property. (Joint Stipulation, ¶¶ 24-25).
After May 26, 1992, Missouri Pacific performed additional engineering and construction labor and provided additional materials in connection with the track relocation work. (Joint Stipulation, ¶ 26). Again, all parties, including SLMLP, benefitted from this effort.
Missouri Pacific ultimately completed its work in the relocation of its tracks. The City of St. Louis took title to the old right-of-way property and dedicated it to the widening of Manchester Avenue. The *693 shopping center project was ultimately completed.

No payment bond for Missouri Pacific.
Neither the City, Midland Equities, nor SLMLP acquired a labor and material payment bond which afforded payment protection to Missouri Pacific. However, a performance bond was provided by McCarthy Brothers Company for the protection of the City of St. Louis and Midland Equities. The McCarthy Brothers bond covered only work performed under contract with McCarthy Brothers or its subcontractors. The bond did not protect Missouri Pacific's right to payment for its work on the St. Louis Marketplace. (Def.Exh.E).

Missouri Pacific's damages.
Missouri Pacific submitted invoice statements for its track relocation labor and material to Midland Equities from November 1, 1991, to October 14, 1993, in the total sum of $2,484,557.13. (Joint Stipulation, ¶ 27). Missouri Pacific was paid a total of $705,801.00 of this amount. (Id.).
The TIF funds proved to be insufficient to pay all of the costs incurred and invoiced by Missouri Pacific. Midland has not paid Missouri Pacific or Union Pacific the unpaid balance invoiced for this work. The last statement upon which any amounts were paid to Missouri Pacific was dated July 29, 1992. The last payment to Missouri Pacific for the track relocation and related railroad work was made on October 21, 1992.
The amounts billed and invoiced by Missouri Pacific were in accordance with the Public Improvements Agreement and were reasonable.

Union Pacific's claims.
Union Pacific is seeking to recover from Midland Equities, SLMLP, and the City defendants the sum of $1,779,348.33, plus interest, for the labor, materials, and effort, Missouri Pacific performed on the public project for which it has not been paid. Union Pacific also seeks payment from Midland Equities and SLMLP of an additional $143,040.00, plus interest, for the difference in value between the preexisting right-of-way property which was transferred by Missouri Pacific and the relocated right-of-way property transferred to it. Midland, SLMLP, and the City defendants have refused to pay any of these amounts.
Union Pacific is asserting three claims against the defendants to recover these monies. The Count I (breach of contract) and Count II (quantum meruit) claims against defendant Midland Equities have been reduced to a consent judgment, the satisfaction of which is the subject of post-judgment proceedings in this Court. Remaining for determination are the Count II (quantum meruit) claim against defendant St. Louis Marketplace Limited Partnership and the Count III claim (for violation of Mo.Rev.Stat. § 107.170) against the City defendants in their individual and official capacities.

Count II: Quantum Meruit.
Plaintiff Union Pacific asserts a quantum meruit claim to recover from defendant St. Louis Marketplace Limited Partnership its unpaid expenditures for relocating the railroad tracks. In Missouri, "there exist two separate remedies for a recovery based upon quasi-contract: unjust enrichment and quantum meruit." Johnson Group, Inc. v. Grasso Bros., Inc., 939 S.W.2d 28, 30 (Mo.Ct.App.1997). Recovery is permitted under quantum meruit for services provided, if the services were provided with the acquiescence of the defendant, and the defendant fails to pay the reasonable value of the plaintiff's labor and materials. Jorritsma v. Tymac Controls Corp., 864 F.2d 597, 599 (8th Cir.1988); Berra v. Papin Builders, Inc., 706 S.W.2d 70, 73 (Mo.Ct.App.1986). The essential elements of quasi-contract or a contract implied in law are:
(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; (3) acceptance and retention by the defendant *694 of that benefit under circumstances in which retention without payment would be inequitable.
Johnson Group, 939 S.W.2d at 30 (quoting Erslon v. Vee-Jay Cement Contracting Co., Inc., 728 S.W.2d 711, 713 (Mo.Ct.App. 1987)).
SLMLP argues that plaintiff, not it, has benefitted from the railroad track relocation. However, the lack of a benefit to plaintiff is not an element of a quantum meruit cause of action. In this case, each of the required facts has been proven. Contrary to defendant's argument, a sufficient benefit was conferred upon it by the efforts of Missouri Pacific. In the contract documents and in the parties' performance of the development contracts, Midland Equities and SLMLP were considered the unified developer. The benefits Missouri Pacific provided under the Public Improvements Agreement were inextricably linked to the ability of Midland and SLMLP to perform their contractual obligations. The performance of these obligations ultimately resulted in the completion of the shopping center project. SLMLP directly benefitted because of its ownership interest in the shopping center project as did Midland as its general partner.
The cases cited by defendant are not apposite. In Landmark Sys., Inc. v. Delmar Redev. Co., 900 S.W.2d 258 (Mo.Ct. App.1995), defendant Taco Bell did not order the labor performed or materials supplied by Landmark and did not negotiate for, authorize, supervise, or monitor the work. Id. at 260. In the case at bar, however, Midland Equities and SLMLP were directly involved with the project.
In Hospital Dev. Corp. v. Park Lane Land Co., 813 S.W.2d 904 (Mo.Ct.App. 1991), the plaintiff architect firm brought suit against Park Lane and other defendants based upon claims of breach of contract, quantum meruit, and account stated. Plaintiff claimed that it was entitled to recover the reasonable value of the services provided to Park Lane. The trial court dismissed the quantum meruit count and the appellate court affirmed. In Park Lane, however, the medical office building was never built with the plaintiff's architectural plans. Id. at 910. Thus, there was no benefit conferred upon the defendant by the plaintiff. Id. In the instant case, however, the railroad track relocation project was completed using engineering services and labor provided by Missouri Pacific.
In Southwestern Bell Tel. Co. v. United Video Cablevision of St. Louis, Inc., 737 S.W.2d 474, 476 (Mo.Ct.App.1987), the court concluded that the equities did not support the invocation of the doctrine of quantum meruit. Id. at 476. In Southwestern Bell, the court found that plaintiff did not experience any additional costs in its unilateral decision to set up and provide certain services to defendant in a manner different from the usual custom. Id. In the case at bar, Missouri Pacific acted within its contractual duties and experienced reasonable costs in doing so.

Union Pacific's damages.
The damages recoverable by Union Pacific on its quantum meruit claim are the reasonable value of the labor and services Missouri Pacific furnished. Johnson Group, 939 S.W.2d at 30. The reasonable amount of these damages is the amount as yet unpaid on the submitted invoices, which the Court finds is reasonably valued at $2,484,557.13, under the terms of the Public Improvements Agreement, Jorritsma, 864 F.2d at 599, less the amount it was paid for this work, $705,801.00, for a net total of $1,778,756.13.
The Missouri Pacific invoices were billed in accordance with the Public Improvements Agreement. The railroad's invoiced charges were fair and reasonable. Midland and St. Louis Marketplace Limited Partnership have been unjustly enriched by the labor and materials provided by Missouri Pacific and it is equitable that SLMLP pay for the reasonable value of such labor and services, set forth above.
*695 Union Pacific, however, is not entitled to recover from SLMLP, on quantum meruit, the difference, $143,040.00, between the value of the original right-of-way, transferred by Missouri Pacific in exchange for the relocated right-of-way. Although this exchange of real estate was necessary for the completion of the shopping center project, the difference in the values of the properties was entirely incidental to any benefit received by SLMLP in the exchange. Also, the difference in values is also incidental to Union Pacific's use of the new right-of-way.
In consequence, plaintiff Union Pacific is entitled to recover from defendant St. Louis Marketplace Limited Partnership compensatory damages in the principal sum of $1,778,756.13.

Prejudgment interest.
Union Pacific also claims prejudgment interest. Prejudgment interest, which may be awarded on a claim for quantum meruit, must be based either upon a statute or provided for by contract. A.G. Edwards & Sons, Inc. v. Drew, 978 S.W.2d 386, 396 (Mo.Ct.App.1998); see also Denton Constr. Co. v. Mo. St. Highway Commission, 454 S.W.2d 44, 59 (Mo. 1970). No contract between Missouri Pacific and St. Louis Marketplace Limited Partnership provides for prejudgment interest. However, prejudgment interest at 9 percent per annum is available under Mo.Rev.Stat. § 408.020.
Entitlement to prejudgment interest has been shown in this case. The amount of the damages to which plaintiff is entitled was discernible from the invoices submitted by Missouri Pacific. However, a prerequisite of an award of prejudgment interest is a sufficient demand for payment of the underlying debt. Mo.Rev.Stat. § 408.020. No sufficient evidence of such a demand by Missouri Pacific or Union Pacific upon St. Louis Marketplace Limited Partnership has been proven, prior to the commencement of this judicial action. However, the filing of the judicial complaint satisfies the requirement of a demand. A.G. Edwards & Sons, Inc., 978 S.W.2d at 397; Weekley v. Wallace, 314 S.W.2d 256, 258 (Mo.Ct.App.1958).
Therefore, simple prejudgment interest at the statutory rate of 9 percent per annum shall be allowed for the period from January 3, 1996, the date this action was commenced, to the date of the judgment filed herewith. Hereafter, interest shall be allowed as provided by 28 U.S.C. § 1961.

Count III: Missouri Revised Statute § 107.170.
Union Pacific claims in Count III damages from the individual City defendants for their alleged violation of Mo.Rev.Stat. § 107.170. That statute mandates that public officials require general contractors for public works of any kind to furnish a payment bond. The statute provided in relevant part:
It is hereby made the duty of all officials, boards, commissions, commissioners, or agents of this state, or of any county, city, town, township, school, or road district in this state in making contracts for public works of any kind to be performed for the state, or for such county, city, town, township, school, or road district, to require every contractor of such work to furnish to the state, or to such county, city, town, township, school, or road district, as the case may be, a bond with good and sufficient sureties, in an amount fixed by said officials ... and such bond, among other conditions, shall be conditioned for the payment of any and all materials ... consumed or used in connection with the construction of such work ... and for all labor performed in such work whether performed by subcontractor or otherwise.
Mo.Rev.Stat. § 107.170 (1986).
The essential elements of § 107.170 are that (1) each responsible public official, when the public entity enters a contract for a public works project *696 of any kind, (2) shall require every contractor performing such work to give a bond, (3) for payment of all labor and materials consumed or used in connection with the project. Layne, Inc. v. Moody, 886 S.W.2d 115, 117 (Mo.Ct.App.1994); National Oil & Supply, Inc. v. Vaughts, Inc., 856 S.W.2d 912, 914 (Mo.Ct.App. 1993). The statute must be broadly construed to carry out the statute's purpose. Maurer v. Werner, 748 S.W.2d 839, 841-42 (Mo.Ct.App.1988).
The Missouri General Assembly enacted § 107.170 to facilitate the construction of public works and to prevent the unjust enrichment of those who receive a material benefit from the project without paying for it. Johnson Controls, Inc. v. Citizens Mem. Hosp. Dist., 952 S.W.2d 791, 793 (Mo.Ct.App.1997); Redbird Engineering Sales, Inc. v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist., 806 S.W.2d 695, 701 (Mo.Ct.App.1991). Section 107.170 protects subcontractors who provide labor and materials on public works projects where the Missouri mechanics' lien laws are inapplicable to provide such protection. Id.; Layne, Inc., 886 S.W.2d at 117. A mechanic's lien cannot be enforced against property "held for the benefit of the public which can be determined to be reasonably necessary for public use." Layne, Inc., 886 S.W.2d at 116. The question of whether the property involved is reasonably necessary for public use must be determined judicially. Id. at 117.
Defendants argue that § 107.170 is not applicable to the facts of this case, because the Public Improvements Agreement was not a contract for public works within the meaning of § 107.170. The Court disagrees. The statute itself does not define the term "contracts for public works." However, other Missouri statutes provide some guidance. "Public works" is defined in the Prevailing Wages on Public Works Act as follows:
all fixed works constructed for public use or benefit or paid for wholly or in part out of public funds.
Mo.Rev.Stat. 290.210 (1986). As set forth above, the Missouri Pacific work in relocating the railroad tracks was to be at least partially paid for from the sales of the public TIF bonds.
Mo.Rev.Stat. § 34.058.1 (1994) provides as follows:
As used in this section, the term "public works contract" means a contract of the state, county, city and other political subdivisions of the state, except the Missouri highways and transportation department, for the construction, alteration, repair, or maintenance of any building, structure, highway, bridge, viaduct, pipeline, public works, or any other works dealing with construction, which shall include, but need not be limited to, moving, demolition, or excavation performed in conjunction with such work.
The work performed by Missouri Pacific was similar to that described in this statute.
The track relocation work was for a public use and benefit. The expressed purpose of the Public Improvements Agreement and the Redevelopment Contract included permitting the City to widen Manchester Avenue, which was necessary so that the St. Louis Marketplace shopping center could be built. Other indicia that Missouri Pacific's work was done pursuant to a contract for "public works" within the meaning of § 107.170 are the following:
1. Payments under the Public Improvements Agreement were required to be and were approved by the City.
2. The actions of Midland and SLMLP with respect to the Substitute Railroad Facility were subject to the approval, customary requirements, and supervision of the City's Board of Public Service.

*697 3. The Public Improvements Agreement expressly stated that Midland's work on the Substitute Railroad Facility was on behalf of the City.
4. The redevelopment of the area in accordance with the Plan was in the public interest and served a public purpose.
In Redbird Engineering Sales, Inc., 806 S.W.2d 695, the Bi-State Development Agency contracted with a material supplier to provide steel in the construction of a garage. The supplier sued Bi-State for its failure to pay for the construction materials. The supplier sought to impose liability upon Bi-State for its failure to post a bond pursuant to § 107.070. The court of appeals reversed the trial court's judgment in favor of Bi-State. In reaching its decision, the appellate court held that the project was not subject to a mechanic's lien and was a "public work" performed for the state. The court stated:
Earlier herein we concluded the project was reasonably necessary for public use so as to render it sheltered from lien imposition.... The project was a work on a property within the Bi-State Metropolitan District insuring service to the public by the care and repair of mass transportation vehicles. In contracting for the work, it was obviously the judgment of the commissioners that such a building would help alleviate mass transportation problems the public was experiencing within the district.... It does not stretch the imagination to see the public benefit that could result from the project's contribution to the orderly and continued flow of public transportation throughout the district. Where respondents as "agents of the state" authorized this project they effectively rendered it a public work to be performed by the state.
Id. at 701.
In the instant case, the widening of Manchester Avenue was central to the public aspect of the Redevelopment Plan, served a public purpose, and was necessary for the public to use the widened Manchester Avenue. Indeed, the widening of Manchester was critical to the ability of the City, Midland, and St. Louis Marketplace to structure the project as a TIF project. The widening of Manchester required the acquisition of Missouri Pacific's railroad tracks and the construction of the substitute railroad facility.
Further, the express language of the Redevelopment Agreement indicates that the City and Midland recognized the need to provide a labor and material payment bond.
Union Pacific is within the class of those intended by the Missouri legislature to be protected by § 107.170. The statute provides that a bond be required to protect any party providing labor and materials under a public works contract whether as a "subcontractor or otherwise." Under the Public Improvements Agreement, Midland was required to provide all of the necessary engineering and construction services to construct the Substitute Railroad Facility. Missouri Pacific agreed to perform this work for which Midland agreed to pay. Both the City and Midland considered Missouri Pacific to be a subcontractor of Midland. See Notestine Dep., p. 23, lines 10-12; Pl.Exh. 13.
The conclusion is inescapable that Missouri Pacific supplied services, labor, and materials in the railroad track relocation work as a "subcontractor or otherwise" within the meaning of § 107.170 and a bond was required to protect it from nonpayment for its efforts.
The City defendants argue that Missouri law requires that Union Pacific first obtain a judgment against Midland Equities and attempt to collect on the judgment, before it pursues a claim under § 107.170. The Court disagrees.
Union Pacific has followed Missouri law by joining Midland and the City defendants in the same suit. George Weis Co. v. *698 Dwyer, 867 S.W.2d 520, 522 (Mo.Ct.App. 1993). In George Weis, a subcontractor filed suit against the contractor, the school superintendent, and school board members. The plaintiff alleged that the school defendants violated § 107.170 in failing to require the contractor to provide a payment bond. The trial court granted the school defendants' motion to dismiss on the grounds that plaintiff failed to allege that recovery could not be made against the contractor. The appellate court reversed, reasoning as follows:
Plaintiff's recovery against the school defendants can occur only if it can establish that any judgment recovered against the contractor is uncollectible in whole or in part. But it does not serve judicial economy to require that the plaintiff try the lawsuit twice and be forced to prove the same facts before two different fact-finders. Where the contractor is a party we will not impose the requirement that the petition allege that recovery against the contractor cannot be effectuated and we do not read the cases to require such a requirement.
Id. at 523. Similarly, in the case at bar, it does not serve judicial economy to require Union Pacific to hold off filing suit against the City defendants until it has obtained an uncollectible judgment against Midland. Such is not required by Missouri law.
The City defendants argue that a contract for "public works" under § 107.170 is limited to work performed solely on public property, because such property is not subject to a mechanic's lien. The Court disagrees.
In this case, Missouri Pacific performed and submitted invoices for some of its work after the rights-of-way properties were exchanged. (Joint Stipulation, ¶¶ 26, 27 and 28). The Missouri mechanic's lien statute provides for a period of six months in which to file a lien after the last work is completed. See Mo.Rev.Stat. § 429.080. Further, under the mechanic's lien laws, the indebtedness does not accrue until the last day's work is completed. Refrigeration Supplies, Inc. v. J.L. Mason of Missouri, Inc., 872 S.W.2d 105, 107 (Mo.Ct. App.1994). As of May 26, 1992, Missouri Pacific's then-billed invoices had all been paid. (Pl.Exh.14). The pre-existing right-of-way was conveyed to the City within 48 hours after Missouri Pacific conveyed it to Midland. (Pl.Exh. 5, at ¶¶ 3.1 and 3.5). Thus, Missouri Pacific could not have filed liens on the property at the time of closing for the amounts ultimately due.
The City defendants further argue that, because the City paid all amounts due to Midland under the Public Improvements Agreement, it would not further the statutory purpose of § 107.170 for the Court to conclude that the Public Improvements Agreement was a public works contract. The Court disagrees.
Missouri law does not insulate public officials, whose government entities have fully paid general contractors, from liability under § 107.170 for the failure of payments due to subcontractors any more than private property owners, who have fully paid general contractors, are insulated from subcontractors' mechanics' liens. Energy Masters Corp. v. Fulson, 839 S.W.2d 665 (Mo.Ct.App.1992).
The City defendants also argue that they are not liable under § 107.170, because they did not let the Public Improvements Agreement in a formal competitive bidding process and they did not treat the Public Improvements Agreement as a "public works" contract under the City of St. Louis Charter and Ordinances. The Court agrees with Union Pacific that the cardinal issue is whether the Public Improvements Agreement is a "public works" contract under Missouri state law, not under City ordinances or the City Charter. Cf., National Oil & Supply, Inc. v. Vaughts, Inc., 856 S.W.2d 912, 914-15 (Mo.Ct.App.1993) (failure to comply with the state law requirement of a written contract does not relieve the county commissioners of liability under § 107.170). *699 The Court has concluded that it was such a public works contract.
The City defendants argue that Union Pacific lacks standing to bring this suit because, had a surety bond been obtained which protected it, the bond surety would not have been liable to it, because the bond would not have covered work performed by Missouri Pacific beyond the geographic area of the St. Louis Marketplace or covered its work performed beyond the date of substantial completion.
A surety's liability would have been discharged if Midland Equities and Missouri Pacific had agreed, without the surety's consent, to any alteration of contractual obligations which resulted in a material increase in the surety's risk. See Continental Bank & Trust Co. v. American Bonding Co., 605 F.2d 1049, 1056 (8th Cir.1979). However, there was no substantial, persuasive evidence that any of the work performed by Missouri Pacific was outside the scope of the project agreements. Nothing in the Public Improvements Agreement limited Missouri Pacific's work to precise geographical limits. (Pl.Exh. 1 at ¶¶ B.1.a, .f, .g). The fact that some work was performed after substantial contractual completion does not mean that this work was outside the scope of the agreements. Substantial completion, for certain contract purposes, did not mean that all of the contractually compensable work has been performed on the project. The Public Improvements Agreement provided for work to be performed after substantial completion. (Pl.Exh. 2, at 5-6). The City's own Plan covered all work associated with relocating the railroad tracks.
The City defendants argue that Union Pacific is estopped from suing on its claims, because it issued a certificate of substantial completion of its project work and conveyed its pre-existing right-of-way property to Midland. The Court disagrees. The doctrine of estoppel is not favored in Missouri and will not be lightly applied. Hospital Products, Inc. v. Sterile Design, Inc., 734 F.Supp. 896, 905 (E.D.Mo.), aff'd, 923 F.2d 859 (8th Cir. 1990); Smith v. Christopher, 737 S.W.2d 510, 513 (Mo.Ct.App.1987); Stenger v. Great Southern Savings & Loan Ass'n, 677 S.W.2d 376, 383 (Mo.Ct.App.1984).
The elements of estoppel are: (1) a lack of knowledge and the absence of the means of knowing the truth about the relevant facts; (2) a good faith reliance upon the conduct or statements of the party sought to be estopped; (3) a resulting change in the position or status of the party claiming the estoppel; and (4) its resulting injury, detriment or prejudice. Hospital Products, Inc., 734 F.Supp. at 905; Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. 1099, 1114 (E.D.Mo.1985).
In the case at bar, the City defendants failed to prove any of these estoppel components. They proved no admission, statement, or act by Missouri Pacific that was inconsistent with the claims asserted. Missouri Pacific never stated that it has been fully paid for all of its labor and materials. No such statement was shown to have been relied upon as a basis for not requiring the statutory payment bond.
The individual City aldermen are properly named as defendants in this action. Section 107.170 mandates that all responsible officials (in this case, the mayor, the comptroller, and the aldermen) require the payment bond, when the City first entered the contracts. Energy Masters, 839 S.W.2d at 670. A contract, even though signed by the Mayor and attested by the Clerk, is not valid unless duly authorized by the Board of Aldermen. Shadowood Dev. Co., Ltd. v. City of Lake St. Louis, 668 S.W.2d 647, 648 (Mo.Ct.App. 1984). Therefore, under Missouri law, the action of the St. Louis Board of Aldermen was necessary for the City to make a contract for public works. In the case at bar, the Board of Aldermen indeed enacted several ordinances that authorized the shopping center development.
*700 Under § 107.170, all the members of the public body, who are responsible for authorizing public works contracts, can be held personally liable for failing in their duty under the statute. E.g., Energy Masters, 839 S.W.2d at 670. The statute does not limit the imposition of liability to the signatory of the public works contract. Consequently, the City defendants in office on July 20, 1990, when the three city ordinances were approved, and on June, 1991, when the Redevelopment Contract and the Public Improvements Agreement were executed, were obligated to require that the statutory bonds be provided by the developers of the shopping center project.
The City defendants argue that they are protected from liability, by official immunity, for their performance of discretionary duties in the development of the St. Louis Marketplace project. The Court agrees.
Under the law of Missouri, officials are not protected by official immunity from liability for the failure to perform ministerial acts; they are so protected in the performance of discretionary acts. The act of requiring a payment bond under Mo.Rev.Stat. § 107.170 is at least partly a ministerial act. See C.A. Burton Mach. Co. v. Ruth, 194 Mo.App. 194, 186 S.W. 737, 738 (1916); see also, George Weis Co., Inc. v. Dwyer, 956 S.W.2d 335, 338 (Mo.Ct. App.1997); S & W Cabinets, Inc. v. Consol. Sch. Dist. No. 6 of Jefferson County, 901 S.W.2d 266, 269 (Mo.Ct.App.1995). A
ministerial act is an act of a clerical nature which a public officer is required to perform upon a given set of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to the official's own judgment or opinion concerning the propriety of the act to be performed.
S & W Cabinets, 901 S.W.2d at 268.
In S & W Cabinets, the court held that the government officials were not liable to plaintiff for their failure to obtain a bond with good and sufficient sureties because of the doctrine of "official immunity." Id. "[T]he doctrine of official immunity shields public officers from tort liability for their judicial or discretionary acts, but not for their ministerial duties." Id. There the court held that the decision whether to accept a particular bond must be considered a discretionary act for which the officials were entitled to official immunity. 901 S.W.2d at 268-69.
In the case at bar, the City defendants, by Ordinance No. 62044, which incorporated the bond requirement provision of the Redevelopment Contract, expressly required the shopping center developers to obtain sufficient performance and payment bonds. Thus, in the view of the Court, they performed their ministerial duty under § 107.170. However, § 107.170 required them also to take sufficient administrative steps to ensure compliance with the statute by the St. Louis Marketplace developers by the purchase of a sufficient bond or bonds. The failure of the City defendants to take sufficient administrative steps to protect Missouri Pacific from nonpayment for its labor and materials was a failure to perform discretionary acts for which the defendants have immunity from suit. Cf., C.A. Burton Machinery Co. v. Ruth, 194 Mo.App. 194, 186 S.W. 737, 738 (1916); see S & W Cabinets, Inc., 901 S.W.2d at 269.
For this reason, judgment will be entered in favor of the City defendants on Union Pacific's Count III claim for the violation of Missouri Revised Statute § 107.170.
An appropriate Judgment is entered herewith.

JUDGMENT
This action has been tried before the undersigned United States Magistrate Judge, sitting without a jury, by consent of the parties under 28 U.S.C. § 636(c). The Court having rendered its findings of fact and conclusions of law,
*701 IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff Union Pacific Railroad Company have and recover from defendant St. Louis Marketplace Limited Partnership the principal sum of $1,778,756.13, plus prejudgment interest at the rate of 9 percent per annum (simple interest) from January 3, 1996, to the date of this judgment, plus post-judgment interest at the rate provided by 28 U.S.C. § 1961, plus the costs of this action.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff Union Pacific Railroad Company have and recover nothing from defendants Irene J. Smith, Nancy Weber, Freeman Bosley, Sr., Bertha Mitchell, Mary Ross, Marit Clark, Phyllis Young, Stephen Conway, Martie J. Aboussie, Craig Schmid, Daniel Gruen, Fred Heitert, Alfred Wessels, Jr., Stephen Gregali, Marge Vining, James Shrewsbury, Joseph D. Roddy, Terry Kennedy, Velma Bailey, Sharon Tyus, Bennice Jones King, Kenneth Jones, Jim Sonderman, Robert Ruggeri, Paul Beckerle, Erving Clay, Gregory Carter, Daniel McGuire, Francis Slay, Geraldine Osborn, Willie Williams, Claude Taylor, Thomas Villa, Michael Sheehan, and Jack Garvey, all in their individual and official capacities; and Vincent C. Schoemehl, Jr., in his individual and official capacity; and Virvus Jones, in his individual and official capacity. The claims against said defendants are dismissed with prejudice, at plaintiff's costs.
NOTES
[1] On August 27, 1997, Union Pacific obtained a consent judgment on its Count I and II claims against Midland Equities in the amount of $2,601,782.73. Union Pacific is prosecuting its remaining claims against the remaining defendants.
[2] The Plan was adopted under the Real Property Tax Increment Allocation Redevelopment Act (TIF Act), Revised Statutes of Missouri §§ 99.800 through 99.865.
[3] The Redevelopment contract incorporated by reference the definition of "the Substitute Railroad Facility" provided in the Public Improvements Agreement, Plaintiff's Exhibit 6. See Pl.Exh. 5, at 6. The "Substitute Railroad Facility" was therein defined as "approximately 1.2 miles of new embankment and dual mainline trackage and a new bridge over McCausland Avenue (the `Substitute Railroad Facility') which shall be constructed on the real estate more particularly described on ... the `Relocated Right of Way' ..." See Pl. Exh. 6, at 1-2.