BRIAN T. HUBBLE, Plaintiff-Appellee, v. BI-STATE DEVELOPMENT AGENCY OF THE ILLINOIS-MISSOURI METROPOLITAN DISTRICT, d/b/a Metro and Bi-State, a/k/a Bi-State Development Agency, Defendant-Appellant.

Fifth District   No. 5—07—0661

Opinion filed August 6, 2009.—Rehearing denied September 11, 2009.

SPOMER, J., dissenting.

Donald L. O'Keefe, of Rabbitt, Pitzer & Snodgrass, P.C., of St. Louis, Missouri, for appellant.

Bruce N. Cook, of Cook, Ysursa, Bartholomew, Brauer & Shevlin, Ltd., of Belleville, for appellee.

JUSTICE STEWART delivered the opinion of the court:

This is an interlocutory appeal pursuant to Illinois Supreme Court Rule 308 (155 Ill. 2d R. 308). The defendant, Bi-State Development Agency of the Illinois-Missouri Metropolitan District, doing business as Metro or Bi-State, also known as Bi-State Development Agency (Bi-State), filed a motion to dismiss the complaint filed by the plaintiff, Brian T. Hubble. The circuit court denied Bi-State's motion to dismiss and then certified the following question of law for our review: "Whether Bi-State Development Agency is a local public entity as defined by the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8—101, and is therefore subject to the one-year statute of limitations set forth in the Act." For the reasons that follow, we answer the certified question in the negative.

BACKGROUND

The St. Louis metropolitan area encompasses counties on both the Illinois side and the Missouri side of the Mississippi River, and Illinois and Missouri share a common interest in the development of mass transportation in this area. In 1949, the two states entered into an

interstate compact agreement to establish an agency responsible for operating public mass transportation facilities in the city of St. Louis and in three Missouri counties and three Illinois counties along the Illinois/Missouri border near St. Louis. The compact identified this area as the "Bi-State Metropolitan Development District" (the District). 45 ILCS 100/1 (West 2006); Mo. Ann. Stat. §70.370 (West 2004). The defendant, Bi-State, is the agency established pursuant to the compact. "Bi-State's entrance into the public transportation business in the St. Louis metropolitan district was necessitated by the deteriorating condition of mass transportation similarly experienced by major urban areas throughout the country." *Ladue Local Lines, Inc. v. Bi-State Development Agency of the Missouri-Illinois Metropolitan District*, 433 F.2d 131, 136 (8th Cir. 1970). One of the services Bi-State provides is public bus transportation throughout the District.

Helen Wilson was a bus driver for Bi-State, and on September 13, 2005, while driving a Bi-State bus, she collided with a vehicle driven by the plaintiff, Brian T. Hubble. On March 1, 2007, Hubble filed a lawsuit against Bi-State, alleging that Wilson's negligence caused the vehicle accident and that Bi-State was vicariously liable for Wilson's negligence. Bi-State filed a motion to dismiss Hubble's complaint pursuant to section 2—619(a)(5) of the Illinois Code of Civil Procedure (735 ILCS 5/2—619(a)(5) (West 2006)), on the grounds that Hubble had filed his complaint outside the time limit under the applicable statute of limitations. The circuit court conducted an evidentiary hearing on Bi-State's motion to dismiss, and on July 26, 2007, the court denied the motion. Bi-State requested the circuit court to make the findings necessary for an immediate interlocutory appeal pursuant to Illinois Supreme Court Rule 308 (155 Ill. 2d R. 308). The circuit court initially denied Bi-State's request to file an interlocutory appeal, but on October 26, 2007, the Illinois Supreme Court entered a supervisory order that directed the circuit court to grant Bi-State's motion for an interlocutory appeal and to stay the proceedings pending the outcome of the appeal. The circuit court, therefore, certified the question concerning the proper statute of limitations for immediate interlocutory appeal. On November 28, 2007, Bi-State filed a petition for leave to appeal, and we granted Bi-State's petition.

Illinois has a two-year general statute of limitations for personal injury actions. 735 ILCS 5/13—204 (West 2006). The Local Governmental and Governmental Employees Tort Immunity Act (the Tort Immunity Act) (745 ILCS 10/1—101 *et seq.* (West 2006)), however, contains a one-year statute of limitations for personal injury claims against local public entities. 745 ILCS 10/8—101(a) (West 2006). Hubble timely filed his complaint against Bi-State if the two-year

general statute of limitations applies to his personal injury claim, but he did not file his complaint in time if the one-year statute of limitations in the Tort Immunity Act applies. Bi-State's interlocutory appeal requires us to determine whether the statute of limitations contained within the Tort Immunity Act applies to Hubble's claim, and the resolution of that issue requires us to determine whether the legislature intended to include interstate compact agencies such as Bi-State within the definition of a "local public entity" in the Tort Immunity Act (745 ILCS 10/1—206 (West 2006)).

We hold that the legislature did not intend to include interstate compact agencies within the Tort Immunity Act's definition of a "local public entity." Accordingly, the one-year statute of limitations contained within the Tort Immunity Act (745 ILCS 10/8—101 (West 2006)) does not apply to Hubble's claim.

## DISCUSSION

The question of whether Bi-State is a "local public entity" under the Tort Immunity Act presents an issue of statutory construction that is guided by well-established legal principles. Statutory construction issues involve questions of law that are reviewed *de novo*. *In re Estate of Andernovics*, 197 Ill. 2d 500, 507, 759 N.E.2d 501, 505 (2001). The primary objective of statutory construction is to determine and give effect to the legislature's intent. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81, 630 N.E.2d 820, 822 (1994). "The words and phrases contained within the language of a statute should not be considered in isolation but must be interpreted in light of other relevant provisions and the statute as a whole." *People v. Spurlock*, 388 Ill. App. 3d 365, 371, 903 N.E.2d 874, 880 (2009). "If possible, we must give effect to every word, clause, and sentence and must not construe a statute in a way that renders any part inoperative, superfluous, or insignificant." *Spurlock*, 388 Ill. App. 3d at 371, 903 N.E.2d at 880. "In addition to the statutory language, the courts may consider the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from construing the law one way or the other." *Spurlock*, 388 Ill. App. 3d at 371, 903 N.E.2d at 880. With these principles in mind, we turn to the statutory language at issue.

Section 8—101(a) of the Tort Immunity Act provides as follows: "No civil action *** may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8—101(a) (West 2006). Section 1—206 of the Tort Immunity Act defines a "local public entity" as follows:

" 'Local public entity' includes a county, township, municipality, municipal corporation, school district, school board, educational service region, regional board of school trustees, trustees of schools of townships, treasurers of schools of townships, community college district, community college board, forest preserve district, park district, fire protection district, sanitary district, museum district, emergency telephone system board, and all other local governmental bodies. 'Local public entity' also includes library systems and any intergovernmental agency or similar entity formed pursuant to the Constitution of the State of Illinois or the Intergovernmental Cooperation Act as well as any not-for-profit corporation organized for the purpose of conducting public business. It does not include the State or any office, officer, department, division, bureau, board, commission, university[,] or similar agency of the State." 745 ILCS 10/1—206 (West 2006).

Preliminarily, we note that the legislature used the term "local entity" in section 8—101(a) of the Tort Immunity Act but used the term "local public entity" in the remainder of the Act. The legislature's use of the term "local entity," rather than "local public entity," in section 8—101(a) appears to be a scrivener's error. In order to construe the statute to effectuate the intent of the legislature, we may alter, supply, or modify words and correct obvious mistakes. *People v. Garrison*, 82 Ill. 2d 444, 455, 412 N.E.2d 483, 489 (1980). It is clear that the legislature intended for section 8—101(a) to apply to actions against a "local public entity" as that term is defined in section 1—206, and we construe the statute accordingly. 745 ILCS 10/1—206, 8—101(a) (West 2006).

Section 1—206 of the Tort Immunity Act contains a list of various governmental entities included within the definition of a "local public entity," but the list does not specifically include agencies created by interstate compacts. 745 ILCS 10/1—206 (West 2006). The supreme court has "observed that the term 'local public entity,' as used in the Tort Immunity Act, is 'broadly defined.' " *Carver v. Sheriff of La Salle County*, 203 Ill. 2d 497, 512, 787 N.E.2d 127, 136 (2003), quoting *Boyles v. Greater Peoria Mass Transit District*, 113 Ill. 2d 545, 553, 499 N.E.2d 435, 438 (1986). " 'Illinois courts have long recognized that various public entities, although not expressly identified in the statute, are within the definition of "local public entity." ' " *Carver*, 203 Ill. 2d at 512, 787 N.E.2d at 136, quoting *Luciano v. Waubonsee Community College*, 245 Ill. App. 3d 1077, 1083, 614 N.E.2d 904, 908 (1993). In order for Bi-State to qualify as a "local public entity," however, it would have to fit within the general catchall category of "other local governmental bodies." To determine whether the legislature intended to include interstate compact agencies within this

general catchall category, we must look at the nature and characteristics of interstate compacts generally and of Bi-State specifically and interpret the Tort Immunity Act in light of those characteristics.

An interstate compact is an agreement between two or more states that addresses a common problem or issue that exists between those states. *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 40, 130 L. Ed. 2d 245, 255, 115 S. Ct. 394, 400-01 (1994). The states initially entered into interstate compacts to settle boundary disputes, but later the states began using interstate compacts for other governmental purposes, including the organization of mass passenger transportation services in urban boundary areas. M. Tripolitsiotis, *Bridge Over Troubled Waters: The Application of State Law to Compact Clause Entities*, 23 Yale L. & Pol'y Rev. 163, 169-72 (2005). The United States Constitution provides authority for states to enter into compacts with one another, but the United States Congress must consent to any such agreement. Article I, section 10, clause 3, of the United States Constitution provides in part, "No State shall, without the Consent of Congress, *** enter into any Agreement or Compact with another State ***." U.S. Const., art. I, §10, cl. 3. Accordingly, interstate compacts involve a minimum of three separate sovereignties: at least two states and the federal government. Agencies created by compacts have characteristics that are unique from any other unit of government.

Upon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law. *International Union of Operating Engineers, Local 542 v. Delaware River Joint Toll Bridge Comm'n*, 311 F.3d 273, 276 (3d Cir. 2002); *Frontier Ditch Co. v. Southeastern Colorado Water Conservancy District*, 761 P.2d 1117, 1123-24 (Colo. 1988), citing *Texas v. New Mexico*, 462 U.S. 554, 564, 77 L. Ed. 2d 1, 12, 103 S. Ct. 2558, 2565 (1983). A compact is a contract, and it may not be amended or modified without the consent of all the parties. *Texas v. New Mexico*, 482 U.S. 124, 128, 96 L. Ed. 2d 105, 114, 107 S. Ct. 2279, 2283 (1987); *Carchman v. Nash*, 473 U.S. 716, 749 n.18, 87 L. Ed. 2d 516, 539 n.18, 105 S. Ct. 3401, 3418 n.18 (1985) (Brennan, J., dissenting, joined by Marshall and Stevens, JJ.). Neither party to a compact may unilaterally pass laws that would burden the compact. *Bi-State Development Agency of the Missouri-Illinois Metropolitan District v. Director of Revenue*, 781 S.W.2d 80, 82 (Mo. 1989). It is "a legal document that must be construed and applied in accordance with its terms." *Texas v. New Mexico*, 482 U.S. 124, 128, 96 L. Ed. 2d 105, 114, 107 S. Ct. 2279, 2283 (1987). Congressional

consent "transforms an interstate compact \*\*\* into a law of the United States." *Cuyler v. Adams*, 449 U.S. 433, 438, 66 L. Ed. 2d 641, 648, 101 S. Ct. 703, 707 (1981). " '[U]nless the compact to which Congress has consented is somehow unconstitutional, no court may order relief inconsistent with its express terms.' " *New Jersey v. New York*, 523 U.S. 767, 811, 140 L. Ed. 2d 993, 1030, 118 S. Ct. 1726, 1750 (1998), quoting *Texas v. New Mexico*, 462 U.S. 554, 564, 77 L. Ed. 2d 1, 12, 103 S. Ct. 2558, 2565 (1983).

Agencies created by interstate compacts are "not neatly pigeon-holed." *Redbird Engineering Sales, Inc. v. Bi-State Development Agency of Missouri-Illinois Metropolitan District*, 806 S.W.2d 695, 699 (Mo. App. 1991). The United States Supreme Court explained, "Gauging actual control, particularly when an entity has multiple creator-controllers, can be a 'perilous inquiry,' 'an uncertain and unreliable exercise.' " *Hess*, 513 U.S. at 47, 130 L. Ed. 2d at 260, 115 S. Ct. at 404, quoting A. Rogers, *Clothing State Governmental Entities With Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine*, 92 Colum. L. Rev. 1243, 1284 (1992). Agencies created by interstate compacts are unlike state-created agencies because "[the] ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates." *Hess*, 513 U.S. at 47, 130 L. Ed. 2d at 260, 115 S. Ct. at 404. However, "no one State alone can control the course of a Compact Clause entity." *Hess*, 513 U.S. at 47, 130 L. Ed. 2d at 260, 115 S. Ct. at 404. They are also distinguishable from state-created agencies by the requirement of congressional authorization before they can function. *Central Midwest Interstate Low-Level Radioactive Waste Comm'n v. O'Leary*, 873 F. Supp. 159, 161 (C.D. Ill. 1995).

As noted above, Bi-State is a compact clause entity created from a compact between Illinois and Missouri. Both the Illinois legislature and the Missouri legislature cooperated in creating Bi-State by enacting identical legislation that adopted the compact agreement. 45 ILCS 105/0.01 *et seq.* (West 2006); Mo. Ann. Stat. §70.370 *et seq.* (West 2004). Illinois and Missouri each gave up a portion of its sovereignty by entering into the compact agreement. The compact defines the powers of Bi-State, and Congress's approval of the compact states that Bi-State is prohibited from exercising any additional powers "unless and until such power or powers shall have been conferred upon the Bi-State Agency by the legislature of one of the States to the compact and concurred in by the legislature of the other and shall have been approved by an Act of Congress." Act of August 31, 1950, Pub. L. No. 81—743, 64 Stat. 568; *Ladue Local Lines, Inc.*, 433 F.2d at 133 n.2.

Under the terms of the compact, Bi-State is "a body corporate and politic," and its powers include the following: (1) planning, constructing, owning, operating, and maintaining bridges, airports, and terminals, (2) making plans for the "co[ ]ordination of streets, highways, parkways, parking areas, terminals, water supply and sewage and disposal works, recreational and conservation facilities and projects, land use pattern[,] and other matters in which joint or coordinated action of the communities within the areas will be generally beneficial," (3) charging and collecting fees, (4) issuing bonds, (5) receiving contributions and appropriations from local, state, and federal governments, (6) disbursing funds for its activities, and (7) performing "all other necessary and incidental functions." 45 ILCS 100/1 (West 2006); Mo. Ann. Stat. §70.370 (West 2004). Bi-State consists of 10 commissioners, 5 appointed from each state, and the agency may "appoint such officers and employees as it may require for the performance of its duties[ ] and shall fix and determine their qualifications and duties." 45 ILCS 100/1 (West 2006); Mo. Ann. Stat. §70.370 (West 2004). In 1959, Missouri and Illinois amended the compact by passing identical legislation that granted Bi-State additional powers necessary to operate and maintain passenger transportation facilities, and Congress approved the exercise of those additional powers in Pub. L. No. 86—303, §2, 73 Stat. 582. 45 ILCS 110/1 (West 2006); Mo. Ann. Stat. §70.373 (West 2004); *Ladue Local Lines, Inc.*, 433 F.2d at 133 n.3.

As with other compact clause agencies, Bi-State's powers are confined by the terms of the compact, and its powers cannot be altered or expanded without the consent of both Illinois and Missouri and approval from Congress. Each state gave up its sovereign right to exclusively control its portion of the District so that Bi-State could operate transportation services within the entire District for the betterment of both states. As a result, neither Illinois nor Missouri may act unilaterally with respect to modifying or expanding Bi-State's powers, duties, or obligations. Bi-State is an autonomous entity that is vested with specific powers and authority to perform specific functions independent from the control of any one state.

Considering the unique nature of Bi-State as a compact clause entity and considering the Tort Immunity Act as a whole, we do not believe that the Illinois legislature intended to include Bi-State within the meaning of the term "local public entity" in the Tort Immunity Act. In construing the Tort Immunity Act, we may consider the consequences of construing the statute one way or the other. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604, 900 N.E.2d 1095, 1101 (2008). Each provision in the Tort Immunity Act

must be evaluated in connection with every other section. *Carroll v. Paddock*, 199 Ill. 2d 16, 23, 764 N.E.2d 1118, 1122 (2002). Construing the Tort Immunity Act to include Bi-State within the definition of a "local public entity" would include Bi-State within the purview of sections of the Tort Immunity Act that cannot validly apply to it.

Article IX of the Tort Immunity Act, which is entitled "Payment of Claims and Judgment," empowers and directs local public entities in the payment of claims and judgments. 745 ILCS 10/9—101 *et seq.* (West 2006). Article IX gives local public entities authorization to pay off judgments in installments over more than one fiscal year. 745 ILCS 10/9—104 (West 2006). Section 9—107 empowers local public entities to levy real estate taxes to cover the cost of insuring or otherwise defending themselves against workers' compensation claims and tort claims for which they are liable under the Tort Immunity Act, as well as the payment of judgments and settlements of those claims. 745 ILCS 10/9—107 (West 2006). Illinois does not have the authority to unilaterally bestow that power to Bi-State.

The dissent concludes that section 9—107 would not invest Bi-State with the power to levy taxes, noting that the act has a separate definition for a "local taxing entity." The plain language of section 9—107 does not limit its application to only a "local taxing entity." (Compare section 9—105 with section 9—107 (745 ILCS 10/9—105, 9—107 (West 2006)).) Section 9—107's plain language invests taxing power to all "local public entit[ies]," and in *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d 490, 497, 739 N.E.2d 508, 512 (2000), the supreme court stated, "Section 9—107 authorizes a local public entity to levy taxes upon all taxable property within its territory for purposes of section 9—102."

Section 9—102 of the Tort Immunity Act *"empower[s] and direct[s]"* local public entities "to pay any tort judgment or settlement for compensatory damages \*\*\* for which it or an employee while acting within the scope of his employment is liable in the manner provided in [article IX]." (Emphasis added.) 745 ILCS 10/9—102 (West 2006); *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d at 497, 739 N.E.2d at 512-13. Section 9—106 requires local public entities to set the rates for their services, or otherwise provide funds, "in an amount sufficient to pay all [their] tort judgments and settlements in accordance with [article IX of the Tort Immunity Act] and [their] obligations under the Workers' Compensation Act, the Workers' Occupational Diseases Act[,] and the Unemployment Insurance Act." 745 ILCS 10/9—106 (West 2006). The legislature's use of the word "shall" in section 9—106 indicates a mandatory requirement on all local public entities. See *People v. Ga-*

*lan*, 229 Ill. 2d 484, 532, 893 N.E.2d 597, 624 (2008) (the word "shall" indicates a mandatory requirement). The dissent maintains that section 9—106 "is in no way inconsistent" with the language of the interstate compact agreement (393 Ill. App. 3d at 1037), but one must ignore the section's mandatory language to reach this conclusion.

The compact agreement between Missouri and Illinois does not give Bi-State the powers or obligations set forth in article IX, and no matter how desirable they may be, Illinois cannot unilaterally convey them to Bi-State by enacting the Tort Immunity Act. "To sanction such practice would lead to discord and a destruction of the purposes for which such bi[ ]state agencies are formed." *Delaware River & Bay Authority v. New Jersey Public Employment Relations Comm'n*, 112 N.J. Super. 160, 166, 175, 270 A.2d 704, 707 (1970). "[T]he unilateral imposition of additional duties on [a compact clause entity] *** is impermissible absent express authorization in the compact or joint legislation by the two creator states." *Delaware River Port Authority v. Commonwealth, State Ethics Comm'n*, 137 Pa. Commw. 170, 175, 585 A.2d 587, 589 (1991). Missouri has not consented to these additional powers or duties contained within article IX of the Tort Immunity Act by enacting identical legislation, nor has Congress granted approval. These provisions in article IX of the Tort Immunity Act, therefore, cannot validly apply to Bi-State.

For example, in *C.T. Hellmuth & Associates, Inc. v. Washington Metropolitan Area Transit Authority*, 414 F. Supp. 408, 409 (D. Md. 1976), the plaintiff sued an interstate compact agency created by Maryland, Virginia, and the District of Columbia. The plaintiff sought copies of certain documents pursuant to Maryland's freedom-of-information statute. *C.T. Hellmuth & Associates, Inc.*, 414 F. Supp. at 409. The plaintiff argued that the compact agency was an agency of the state and was within the purview of Maryland's freedom-of-information statute. *C.T. Hellmuth & Associates, Inc.*, 414 F. Supp. at 409. The court, however, held that Maryland's statute did not apply to the compact. *C.T. Hellmuth & Associates, Inc.*, 414 F. Supp. at 410.

The court noted that one party to a compact cannot "enact legislation which clearly would affect the other parties' interests." *C.T. Hellmuth & Associates, Inc.*, 414 F. Supp. at 409. One party to a compact cannot unilaterally determine the types of information that should be accessible to the public and the circumstances under which the information would be made available. *C.T. Hellmuth & Associates, Inc.*, 414 F. Supp. at 410. The court concluded that Maryland could not impose its freedom-of-information statute on the compact agency because that imposition would be in derogation of the compact and would be an intrusion on Virginia's and the District of Columbia's interests. *C.T. Hellmuth & Associates, Inc.*, 414 F. Supp. at 410.

Likewise, in the present case, article IX of the Tort Immunity Act cannot apply to Bi-State because the Illinois legislature cannot unilaterally grant additional powers to or place additional burdens on Bi-State without an express concurrence from Missouri and congressional approval. Since the term "local public entity" as used in article IX of the Tort Immunity Act cannot apply to Bi-State, we construe the statute's definition of a "local public entity" to exclude Bi-State for all the provisions of the Tort Immunity Act. "[T]he use of the same words or phrases in different sections of a statute should be given a consistent meaning unless legislative intent to the contrary is clearly expressed." *Mirabella v. Retirement Board of the County Employees' Annuity & Benefit Fund*, 198 Ill. App. 3d 971, 974, 556 N.E.2d 686, 688 (1990). In addition, we must not construe the Tort Immunity Act in a way that renders any part inoperative, superfluous, or insignificant. *Bauer v. H.H. Hall Construction Co.*, 140 Ill. App. 3d 1025, 1028, 489 N.E.2d 31, 33 (1986).

Construing the Tort Immunity Act to include Bi-State within the definition of a "local public entity" would be in derogation of the compact and Congress's approval of the compact. We presume that the legislature did not intentionally enact a statute that included invalid provisions. In addition, we presume that the legislature acted with knowledge of the terms of the bistate compact agreement, the terms of Congress's approval of the agreement, and the limitation on Illinois's ability to modify Bi-State's powers or impose obligations on Bi-State. *People v. Jones*, 214 Ill. 2d 187, 199, 824 N.E.2d 239, 246 (2005) (it is presumed the legislature acts rationally and with full knowledge of all prior legislation).

Furthermore, the Illinois legislature has demonstrated its knowledge that Illinois and Missouri must enact identical legislation in order to modify Bi-State's powers. After the compact was created in 1949, Illinois and Missouri amended the compact in 1959 to authorize Bi-State to operate and maintain passenger transportation facilities. Bi-State was invested with these additional powers by Illinois and Missouri enacting identical legislation that set out the additional powers and after Congress approved the additional powers. *Ladue Local Lines, Inc.*, 433 F.2d at 133.

In 1980, Illinois and Missouri amended the compact to empower Bi-State to transfer property. Pub. Act 81—1419, eff. August 29, 1980. At the third reading of the bill amending Illinois's compact legislation, one of the bill's sponsors explained as follows:

"[I]t became necessary for [B]i-[S]tate to exchange some property with the Illinois Department of Transportation[,] and there was a ruling that came down from the Attorney General's Office that

they did not have statutory authority to transfer property. So the Attorney [*sic*] General of Illinois and of Missouri recommended this legislation. Missouri has already passed identical legislation[,] and it's required that both states pass identical legislation so that the authority to transfer property is legal \*\*\*." 81st Ill. Gen. Assem., House Proceedings, June 12, 1980, at 51 (statements of Representative Flinn).

The other cosponsor stated: "[J]ust last week Governor Teasdale in Missouri signed the identical legislation, since the Bi-State Compact . . . identical legislation in this regard, has to be signed by both states. Missouri has done their job, and now we are seeking to do the same thing here in Illinois \*\*\*." 81st Ill. Gen. Assem., Senate Proceedings, May 7, 1980, at 46 (statements of Senator Vadalabene). Senator Moore added: "This is a compact between the State of Illinois and the State of Missouri. The laws have to be identical between these two states in order for this particular district to function." 81st Ill. Gen. Assem., Senate Proceedings, May 7, 1980, at 47 (statements of Senator Moore).

In 1985, the legislature passed a bill to amend the compact agreement to allow Bi-State to promote and build a world-trade center. Pub. Act 84—247, eff. January 1, 1986. The bill's cosponsor explained as follows:

"It affects the City of St. Louis and the metro east area[ ] and the Bi-[S]tate Development Agency. In order to do anything in that area with [Bi-State], we must, both Missouri and Illinois, pass identical Bills. And what this Bill does is three basic things. It permits Bi-[S]tate to promote to develop the World Trade Center, to make contracts with all governments; local, state, or federal government; but, under no circumstances can the State of Illinois spend any of the state money involved in this project. It's a permissive thing. We have to wait on Missouri to pass the identical Bill out." 84th Ill. Gen. Assem., House Proceedings, June 20, 1985, at 182 (statements of Representative Flinn).

In 1994, the compact agreement was amended to grant Bi-State the power to hire a security force. Pub. Act 88—611, eff. January 1, 1995. Again, the bill's cosponsor explained the need for identical legislation from both Missouri and Illinois:

"[W]e have light[ ]rail added to [Bi-State's] transportation system down there, and we need the authority, in the case there's a need for police officers, to hire police officers. We want to do it through contract. This is a Missouri-Illinois, Bi-State agency, and both states must pass some identical laws so it can be ratified by Congress.

\* \* \*

\*\*\* Congress will ratify this, but they cannot ratify it unless both

states have identical Bills and it's a request by Bi-State to start with. So, both the Legislature in Missouri and our Legislature here, in Illinois [*sic*].

\*\*\*

\*\*\* Since this is a compact agency made by Congress to start with, each time they make a change up or down in their authority, it has to be ratified by Congress, but first it must be passed by both states." 88th Ill. Gen. Assem., House Proceedings, June 8, 1994, at 58-59 (statements of Representative Flinn).

Accordingly, the Illinois legislative history of the compact agreement demonstrates that the Illinois legislature is cognizant that Missouri and Illinois must enact identical legislation on matters involving Bi-State's powers and is aware of the need for congressional approval. Therefore, we do not believe that the legislature intended to sweep Bi-State into the purview of the Tort Immunity Act with the general catchall phrase "all other local governmental bodies," when doing so would invest Bi-State with invalid powers, such as the power to levy taxes (745 ILCS 10/9—107 (West 2006)). "Bi-State has no taxing power." *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1087 (8th Cir. 1991). If the legislature intended to include compact agencies such as Bi-State within the terms of the Tort Immunity Act, it would have done so expressly and in a way that would not have included those agencies within provisions of the Act that cannot apply to them. Illinois and Missouri had already created Bi-State by the time the Illinois legislature enacted the Tort Immunity Act in 1965. Neither party has pointed out and we have not found anything in the legislative history of the Tort Immunity Act that indicates that the legislature considered Bi-State specifically or interstate compact agencies generally in drafting the definition of a "local public entity" or in drafting any amendments to the definition. Without an express statement of intent from the legislature, we decline to extend the definition of a "local public entity" to include interstate compact agencies under a general catchall term. We hold that Bi-State is not a local public entity under the Tort Immunity Act; therefore, claims against Bi-State are not controlled by the one-year statute of limitations contained in section 8—101(a) of the Tort Immunity Act (745 ILCS 10/8—101(a) (West 2006)).

We are not asked to determine whether the State of Illinois can unilaterally enact a valid statute of limitations applicable to claims against Bi-State or whether such an enactment requires identical Missouri and Illinois laws along with Congress's approval. Contrary to the dissent's assertion, we take no position on that issue. Our only task is to answer the certified question, and in order to answer that question,

we must determine the legislature's intent. For the reasons noted above, our only holding in this decision is that the legislature did not intend to include Bi-State within the Tort Immunity Act's definition of a "local public entity."

In support of its argument that it qualifies as a local public entity, Bi-State cites *Grady v. Bi-State Development Agency*, 151 Ill. App. 3d 748, 502 N.E.2d 1087 (1986), where a different panel of this court held that Bi-State was a local public entity under the Tort Immunity Act. In that case, the plaintiff sued Bi-State for injuries she sustained while she was a passenger on one of Bi-State's buses. *Grady*, 151 Ill. App. 3d at 749, 502 N.E.2d at 1088. At that time, the Tort Immunity Act required a plaintiff with a claim against a local public entity to give "notice of her claim within one year from the date that the injury was received or the cause of action accrued." *Grady*, 151 Ill. App. 3d at 749, 502 N.E.2d at 1088, citing Ill. Rev. Stat. 1981, ch. 85, par. 8—102. The *Grady* court held that Bi-State was a local public entity under the Tort Immunity Act and that the plaintiff had failed to give Bi-State notice of her claim as required by the Tort Immunity Act. *Grady*, 151 Ill. App. 3d at 750, 502 N.E.2d at 1089.

We cannot overrule *Grady* (see *In re Marriage of Gutman*, 232 Ill. 2d 145, 149-50, 902 N.E.2d 631, 633-34 (2008)) but we disagree with the *Grady* court's analysis, and we decline to follow it. We do not do so lightly, and we are mindful that considerations of *stare decisis* weigh heavily in the construction of a statute (*People v. Antoine*, 286 Ill. App. 3d 920, 924, 676 N.E.2d 1374, 1377 (1997)). *Stare decisis*, however, should not preclude us from correcting a mistake and interpreting the statute correctly. *People v. Mitchell*, 189 Ill. 2d 312, 339, 727 N.E.2d 254, 270 (2000). "Where it is clear that the court has made a mistake it will not decline to correct it, even though the rule may have been re[ ]asserted and acquiesced in for a long number of years." *Maki v. Frelk*, 40 Ill. 2d 193, 196, 239 N.E.2d 445, 447 (1968).

The court in *Grady* did not analyze the nature of Bi-State as a compact clause entity and did not consider the consequences of including Bi-State within the definition of a "local public entity" "in light of other relevant provisions and the statute as a whole." *Spurlock*, 388 Ill. App. 3d at 371, 903 N.E.2d at 880. We believe that *Grady*'s construction of the Tort Immunity Act to include Bi-State within the definition of a "local public entity" is contrary to legislative intent and, therefore, is prejudicial to the public interest. We will not follow a rule of law, no matter how well established, if doing so is likely to create "serious detriment" that is "prejudicial to the public interest." *McClintock v. Bi-State Development Agency*, 228 Ill. App. 3d 382, 385, 591 N.E.2d 967, 970 (1992).

The dissent accuses us of turning "the concept of precedent on its head" and maintains that we are bound to follow *Grady* under horizontal *stare decisis* principles. 393 Ill. App. 3d at 1034. We disagree. In Illinois, " '*stare decisis* requires courts to follow the decisions of higher courts[ ] but does not bind courts to follow decisions of equal or inferior courts.' " *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 392 n.2, 830 N.E.2d 575, 582 n.2 (2005), quoting *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102, 697 N.E.2d 868, 871 (1998). "[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels." *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440, 892 N.E.2d 994, 1006-07 (2008). Accordingly, our panel is not bound by the earlier opinions of different panels of this court, and we can "part company with [earlier] decision[s] without offending the doctrine of *stare decisis*." *O'Casek*, 229 Ill. 2d at 440, 892 N.E.2d at 1007. We may deviate from our own precedent when we believe we have good cause, such as when the governing decision is badly reasoned. *People v. Jones*, 207 Ill. 2d 122, 134, 797 N.E.2d 640, 647 (2003).

We realize that when we reexamine an issue already ruled upon and arrive at an inapposite decision, "the reliance interests of litigants, the bench, and the bar" are affected. *O'Casek*, 229 Ill. 2d at 440, 892 N.E.2d at 1006. However, our duty as a reviewing court is to reach the correct decision under the law, and this duty is superior to all other considerations, including *stare decisis*. See *People v. Mitchell*, 189 Ill. 2d 312, 339, 727 N.E.2d 254, 270 (2000).

We are not bound by the *Grady* decision. Because we believe that *Grady* fundamentally misstates the law, we have good cause to depart from it, and our departure is consistent with the above principles of horizontal *stare decisis*. In fact, our good cause to deviate from *Grady* is highlighted by the dissent's citation to *Grady* for the incorrect proposition of law that Bi-State's powers include "exercising additional powers as shall be conferred on it by either State legislature." *Grady*, 151 Ill. App. 3d at 750, 502 N.E.2d at 1089, citing Ill. Rev. Stat. 1981, ch. 127, par. 63r—1; 393 Ill. App. 3d at 1035-36. Congress's approval of the compact does not grant Bi-State the power to exercise "additional powers as shall be conferred on it by either state legislature." Congress's approval of the compact amended the compact agreement to prohibit Bi-State from exercising any additional powers "unless and until such power or powers shall have been conferred upon the Bi-State Agency by the legislature of one of the States to the compact and concurred in by the legislature of the other and shall have been approved by an Act of Congress." Act of August 31, 1950, Pub. L. No.

81—743, 64 Stat. 568; *Ladue Local Lines, Inc.*, 433 F.2d at 133 n.2. The *Grady* court's analysis does not take into consideration Congress's amendment to the compact agreement and, as a result, fundamentally misstates the law concerning Bi-State's powers.

At the hearing on Bi-State's motion to dismiss, the circuit court admitted the entire appellate record in *Grady* into evidence. Accordingly, the *Grady* record is a part of the record on appeal in the present case. In *Grady*, the party opposing Bi-State's status as a local public entity chose not to participate in the appeal; therefore, the *Grady* court did not have the benefit of fully developed arguments on both sides of the issue. By contrast, in the present case, the issue of Bi-State's status as a local public entity was fully litigated with an evidentiary hearing and extensive briefing on both sides of the issue. Therefore, the issue of Bi-State's status as a local public entity is ripe for a reexamination based on the record before us, and a full review of the issue is consistent with the supreme court's exercise of its supervisory authority that directed the circuit court to certify the question for our review.

The dissent finds support for its position in the Illinois Supreme Court's exercise of its supervisory authority in the present case, insinuating that the court's rare exercise of its supervisory authority reflects a veiled message from the court on how we should decide the merits of this case. Again, we disagree. The supreme court directed the circuit court to certify for an immediate appeal the issue of whether Bi-State is a local public entity under the Tort Immunity Act so the issue could be reviewed and analyzed by this court. The supreme court's order was silent on the merits of the issue, and we do not take the supreme court's supervisory order to mean anything more than what it says. If the supreme court's supervisory order implied anything, it implied that we should fully consider the issue on its merits, and that is what we have done in deciding this case.

The dissent also finds support for the conclusion that Bi-State is a local public entity in the language of section 2 of the Transportation Cooperation Act of 1971 (the Transportation Cooperation Act) (5 ILCS 225/2 (West 2006)). The Transportation Cooperation Act grants authority to "units of local government" to join together by agreement or contract in order to develop, operate, and promote transportation systems and create a Transportation Service Association to exercise all powers conferred by the act. 5 ILCS 225/3, 4 (West 2006). Section 2 of the Transportation Cooperation Act defines "units of local government" to include "any authority, commission[,] or other entity which by virtue of an interstate compact approved by Congress is authorized to provide mass transportation." 5 ILCS 225/2(e) (West

2006). We do not find the Transportation Cooperation Act persuasive because that statute was passed contrary to the Bi-State compact agreement. As we have previously noted, Congress amended the compact to prohibit Bi-State from exercising any additional powers "unless and until such power or powers shall have been conferred upon the Bi-State Agency by the legislature of one of the States to the compact and concurred in by the legislature of the other and shall have been approved by an Act of Congress." Act of August 31, 1950, Pub. L. No. 81—743, 64 Stat. 568; *Ladue Local Lines, Inc.*, 433 F.2d at 133 n.2. The Transportation Cooperation Act has not been passed by the Missouri legislature, nor has Congress approved its application to Bi-State.

Moreover, to the extent that the Transportation Cooperation Act is relevant, it demonstrates that when the Illinois legislature intends to include interstate compact agencies within a statute's general definition, it does so expressly. In the present case, had the legislature intended to include compact clause agencies within the definition of a "local public entity" in the Tort Immunity Act, it would have used similar language, instead of relying on the general catchall phrase "all other local governmental bodies."

As a final matter, we address the evidentiary hearing the circuit court conducted on the motion to dismiss. In opposing Bi-State's motion to dismiss, the plaintiff's counsel argued that the *Grady* opinion was procured by fraudulent statements contained in Bi-State's *ex parte* petition for leave to appeal and in its brief in that case. As noted above, at the hearing on Bi-State's motion to dismiss, the circuit court admitted the entire appellate record in *Grady* into evidence. In addition, the circuit court received testimony from Bi-State's general counsel concerning the *Grady* appeal.

Bi-State's general counsel testified that she did not represent Bi-State in the *Grady* appeal, but she identified incorrect statements contained in Bi-State's brief in the *Grady* appeal. First, Bi-State's brief in *Grady* incorrectly stated that Bi-State was formed pursuant to the Local Mass Transit District Act (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 351 *et seq.* (now see 70 ILCS 3610/1 *et seq.* (West 2006))), rather than the Bi-State Development Compact Act (Ill. Rev. Stat. 1981, ch. 127, par. 63r—1 *et seq.* (now see 45 ILCS 100/0.01 *et seq.* (West 2006))). Second, the brief incorrectly stated that the Metro-East Mass Transit District of St. Clair County, which was formed pursuant to the Local Mass Transit District Act (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 351 *et seq.* (now see 70 ILCS 3610/1 *et seq.* (West 2006))), was a division of Bi-State. Bi-State's general counsel explained that Bi-State provides bus and rail service to St. Clair County through a contract with Metro-East Mass Transit District of St. Clair County.

At the conclusion of the evidentiary hearing, the circuit court denied Bi-State's motion to dismiss. The circuit court declined to follow *Grady*, in part, because the court concluded that the incorrect statements in Bi-State's *Grady* brief "were deliberate lies that [Bi-State] knew would not be contradicted." The circuit court concluded, "*Grady*, a decision procured by fraud, should be accorded the weight it deserves, none."

The circuit court overstepped its authority in finding that the *Grady* decision was procured by fraud and should not be accorded precedential value. A circuit court does not have authority to collaterally attack controlling appellate court case authority or its precedential value by independently reviewing the underlying appellate court file and scrutinizing the winning parties' arguments. *Grady* was binding authority, and a circuit court was not free to disregard it. *In re R.C.*, 195 Ill. 2d 291, 298, 745 N.E.2d 1233, 1238 (2001). "It is the absolute duty of the circuit court to follow the decisions of the appellate court." *In re A.A.*, 181 Ill. 2d 32, 36, 690 N.E.2d 980, 982 (1998). Parenthetically, we note that in its analysis the *Grady* court did not rely on any of the incorrect statements.

The circuit court was obligated to apply its findings of fact to the law established by our *Grady* decision. The proper procedure when a circuit court entertains a genuine doubt about the continued vitality of established precedent is to "rule in accordance with existing law and enter a Rule 304(a) finding (155 Ill. 2d R. 304(a)) or certify the question for interlocutory appeal under Rule 308 (155 Ill. 2d R. 308)." *In re Marriage of Baylor*, 324 Ill. App. 3d 213, 218, 753 N.E.2d 1264, 1268 (2001).

## CONCLUSION

For the foregoing reasons, we hold that Bi-State is not a local public entity as defined by section 1—206 of the Tort Immunity Act (745 ILCS 10/1—206 (West 2006)).

Certified question answered.

CHAPMAN, J., concurs.

JUSTICE SPOMER, dissenting:

I respectfully dissent. As reflected in the Illinois Supreme Court's rare exercise of its supervisory authority over the circuit court, the trial judge's order denying Bi-State's motion to dismiss is a clear violation of the well-established doctrine of *stare decisis*. Although my colleagues recognize that under a vertical application of the doctrine

" '[i]t is the absolute duty of the circuit court to follow the decisions of the appellate court' " (*In re R.C.*, 195 Ill. 2d 291, 297 (2001), quoting *In re A.A.*, 181 Ill. 2d 32, 36 (1998)), for the following reasons, I find the majority disposition only compounds the error of the trial judge by its misapplication of horizontal *stare decisis*. In the end, the majority opinion eviscerates this cornerstone of American jurisprudence and turns the concept of precedent on its head.

Twenty-three years ago, in the case of *Grady v. Bi-State Development Agency*, 151 Ill. App. 3d 748, 749 (1986), this court was asked to decide whether Bi-State is a "local public entity" within the purview of section 1—206 of the Local Governmental and Governmental Employees Tort Immunity Act (the Act) (Ill. Rev. Stat. 1981, ch. 85, par. 1—206) for purposes of the previous requirement under section 8—102 of the Act (Ill. Rev. Stat. 1981, ch. 85, par. 8—102) that a plaintiff provide a defendant with notice of her claim within one year from the date that the injury was received or the cause of action accrued. *Grady*, 151 Ill. App. 3d at 749. Notwithstanding the plaintiff's arguments to the contrary, *Grady* is binding authority on the issue of whether Bi-State is a "local public entity." This court's holding in *Grady* that Bi-State is a "local public entity" is not *dicta*, because in order to determine whether Bi-State was entitled to notice, it was necessary to determine whether Bi-State was a "local public entity." See *American Country Insurance Co. v. Cline*, 309 Ill. App. 3d 501, 510 (1999) (*dicta* is a matter on which a court offers an opinion that is not necessary to the disposition of the litigation). Although the notice requirement has been repealed and was replaced by a one-year statute of limitations, this change in the Act is irrelevant to the *Grady* analysis of whether Bi-State meets the definition of a "local public entity" set forth in section 1—206 of the Act.

In addition, the amendments to section 1—206 of the Act that took place after the opinion in *Grady* had been filed do not diminish the precedential value of *Grady*. After this court's decision in *Grady*, the definition of a "local public entity" was expanded. All of the language in the previous definition, under which this court analyzed Bi-State's status in *Grady*, remains in the definition. Finally, as the majority recognizes, the false statements of fact and law made by counsel for Bi-State in the *Grady* appeal were not relied upon by the *Grady* court when it rendered its opinion. Although Bi-State's brief in *Grady* states that Bi-State was formed pursuant to the Local Mass Transit District Act, the *Grady* opinion correctly states that Bi-State was formed pursuant to the Bi-State Development Compact Act. The *Grady* opinion makes no reference to the Metro-East Mass Transit District of St. Clair County as a division of Bi-State. For all of these

reasons, there can be no doubt that *Grady* is binding precedent on the issue of whether Bi-State is a "local public entity."

The Illinois Supreme Court has held that " ' "when a rule of law has once been settled, contravening no statute or constitutional principle, such rule ought to be followed unless it can be shown that serious detriment is thereby likely to arise prejudicial to public interests." ' " *People v. Sharpe*, 216 Ill. 2d 481, 520 (2005), quoting *Vitro v. Mihelcic*, 209 Ill. 2d 76, 82 (2004), quoting *Maki v. Frelk*, 40 Ill. 2d 193, 196 (1968). In accordance with this principle, this court has twice reaffirmed Bi-State's status as a "local public entity" as defined in the Act. See *Cooper v. Bi-State Development Agency*, 158 Ill. App. 3d 19, 23 (1987); *McClintock v. Bi-State Development Agency*, 228 Ill. App. 3d 382, 385 (1992). "Considerations of *stare decisis* weigh heavily in the area of statutory construction, especially where the legislature is free to change the court's interpretations of its legislation." *McClintock v. Bi-State Development Agency*, 228 Ill. App. 3d 382, 385 (1992), citing *Williams v. Crickman*, 81 Ill. 2d 105, 111 (1980).

Notwithstanding the foregoing, the majority cites *Maki*, 40 Ill. 2d at 196, as authority for its departure from the principles of horizontal *stare decisis*. However, my colleagues fail to show how the settled rule of law in this case contravenes any statute or constitutional principle or is likely to cause a serious detriment that is prejudicial to the public interests. See *Maki*, 40 Ill. 2d at 196. Furthermore, the majority fails to acknowledge that the Illinois Supreme Court in *Maki* declined to overturn established precedent, stating, "The rule of *stare decisis* is founded upon sound principles in the administration of justice, and rules long recognized as the law should not be departed from merely because the court is of the opinion that it might decide otherwise were the question a new one." 40 Ill. 2d at 196-97. The majority's analysis falls far short of explaining why the settled rule of law in this case should be overturned. Section 1—206 of the Act defines a "local public entity" very broadly to include "all other local governmental bodies." 745 ILCS 10/1—206 (West 2006). As recognized by this court in *Grady*, there can be no question that Bi-State was created to exercise public or governmental functions. *Grady*, 151 Ill. App. 3d at 750. Section 1 of the Bi-State Development Compact Act (45 ILCS 100/1 (West 2006)) provides that Bi-State " 'shall be a body corporate and politic.' " *Grady*, 151 Ill. App. 3d at 750. "[Bi-State's] powers include: (1) planning, constructing, and maintaining bridges, airports, and terminal facilities; (2) making plans for the coordination of streets and highways; (3) charging and collecting fees; (4) issuing bonds; (5) receiving contributions from local, State, and Federal governments; and (6) exercising additional powers as shall be conferred on it by either State

legislature." *Grady*, 151 Ill. App. 3d at 750, citing Ill. Rev. Stat. 1981, ch. 127, par. 63r—1; see 45 ILCS 100/1 (West 2006).

Having determined that Bi-State is a governmental entity, there can also be no doubt that Bi-State fits squarely within the definition of a "local public entity" within the meaning of the Act if it can properly be determined to be "local." Article VII, section 1, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VII, §1) defines "units of local government" to include "units, designated as units of local government by law, which exercise limited governmental powers or powers in respect to limited governmental subjects." Importantly, the Transportation Cooperation Act of 1971 (5 ILCS 225/2(e) (West 2006)) defines a "unit of local government" to include "any authority, commission[,] or other entity which by virtue of an interstate compact approved by Congress is authorized to provide mass transportation." Section 1(1) of the Bi-State Development Powers Act (45 ILCS 110/1(1) (West 2006)), which sets forth additional powers of Bi-State, authorizes Bi-State to "operate *** passenger transportation facilities[ ] and air, water, rail, motor vehicle[,] and other terminal or parking facilities." Accordingly, Bi-State has been designated as a unit of local government by law. Thus, it fits squarely within the definition of a "local public entity" set forth in section 1—206 of the Act because it is a "local governmental body."

I find further support for the foregoing conclusion in the analysis of the United States Court of Appeals, Eighth Circuit, in *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1088 (8th Cir. 1991), which concluded that because, on balance, Bi-State is more like a local governmental entity than an arm of Missouri and Illinois, it is not entitled to sovereign immunity under the eleventh amendment to the United States Constitution. In so holding, the court explained as follows:

"State law characterizes Bi-State as a local public body. Much like a county, Bi-State's object is to plan, develop, and engage in proprietary functions in a defined region with local governance, for the common good of the communities within the region." *Barket, Levy & Fine, Inc.*, 948 F.2d at 1088.

The majority's holding rests primarily on its determination that "[c]onstruing the Tort Immunity Act to include Bi-State within the definition of a 'local public entity' would include Bi-State within the purview of sections of the Tort Immunity Act that cannot validly apply to it." 393 Ill. App. 3d at 1024. However, in so doing, I believe that the majority misinterprets article IX of the Act (745 ILCS 10/9—101 *et seq.* (West 2006)) and misconstrues the law as it relates to interstate compact agreements. Contrary to the majority's assertions, there is

nothing in article IX of the Act that is incongruent with the interstate compact which created Bi-State, and no section of article IX modifies Bi-State's powers or imposes additional obligations on Bi-State. First, article IX in no way invests in Bi-State the power to levy taxes. Section 9—101(c) of the Act expressly recognizes that not all local public entities have the power to levy taxes when it defines a "local taxing entity" as "a local public entity that has the power to levy *or have levied on its behalf* taxes or assessments upon property within the territory of the entity." (Emphasis added.) 745 ILCS 10/9—101(c) (West 2006).

The interstate compact that created Bi-State specifically conveys on Bi-State the powers to have taxes levied on its behalf when it authorizes Bi-State in article III, paragraph 5, "[t]o receive for its lawful activities any contributions or moneys appropriated by municipalities, counties, state[,] or other political subdivisions or agencies." 45 ILCS 100/1 (West 2006). Accordingly, section 9—107 of the Act (745 ILCS 10/9—107 (West 2006)) is in no way incongruent with the interstate compact when it provides that a local public entity may annually levy *or have levied on its behalf* property taxes in an amount sufficient to cover the costs of insurance and judgments against it. In addition, section 9—107 does not require local public entities to have those taxes levied but, like the interstate compact, simply gives them authority to do so.

Moreover, section 9—106 of the Act is in no way inconsistent with the interstate compact that created Bi-State when it authorizes local public entities to set the rate for their services "in an amount sufficient to pay all [their] tort judgments and settlements." 745 ILCS 10/9—106 (West 2006). To the contrary, article III, paragraph 3, of the interstate compact specifically authorizes Bi-State "[t]o charge and collect fees for use of the facilities owned and operated by it" (45 ILCS 100/1 (West 2006)) and in no way limits the amounts that Bi-State can charge and collect. Finally, section 9—104 of the Act (745 ILCS 10/9—104 (West 2006)), which merely sets forth a procedure by which local public entities may pay judgments in installments over more than one fiscal year, does not in any way impose an additional power or obligation on Bi-State. For all of these reasons, I disagree with the majority's use of article IX of the Act as a vehicle by which to dissolve the longstanding precedent set by *Grady*. It is simply wrong.

Agencies that are created by interstate compacts do not exist in a vacuum. See *Delaware River Port Authority v. Commonwealth, State Ethics Comm'n*, 137 Pa. Commw. 170, 172, 585 A.2d 587, 588 (1991). "The key question *** is whether application of [the Act] constitutes [a] unilateral imposition of additional duties, powers[,] or responsibili-

ties on [Bi-State]" (*Delaware River Port Authority*, 137 Pa. Commw. at 173, 585 A.2d at 588). The stated purpose of the Act is "to protect local public entities *** from liability arising from the operation of government. It grants only immunities and defenses." 745 ILCS 10/1—101.1(a) (West 2006). It in no way burdens the compact and, thus, is distinguishable from the statutes found to be inapplicable to the similar compact agencies at issue in the other cases set forth by the majority. See *Delaware River Port Authority*, 137 Pa. Commw. at 174, 585 A.2d at 589 (requirement by one state that employees of the bistate agency file financial interest statements); see also *Delaware River & Bay Authority v. New Jersey Public Employment Relations Comm'n*, 112 N.J. Super. 160, 165-66, 270 A.2d 704, 707 (1970) (application of one state's public-employee-relations statute to the bistate agency); see also *C.T. Hellmuth & Associates, Inc. v. Washington Metropolitan Area Transit Authority*, 414 F. Supp. 408, 409 (D. Md. 1976) (applicability of one state's freedom-of-information law to the bistate agency). Accordingly, I find the majority's assertion that the Act somehow imposes a unilateral duty or power on Bi-State to be misplaced. Thus, I do not believe that the legislature's decision to define a "local public entity" in such a way as to include Bi-State within the purview of the Act is in any way a violation of the interstate compact agreement.

In addition, I find the majority's discussion of the legislative history of the compact agreement to have no bearing on whether our legislature intended to include Bi-State within the definition of a "local public entity" as defined in the Act. I recognize that because Bi-State was created by an interstate compact between Missouri and Illinois, the states must pass identical legislation in order to amend the compact itself because it constitutes a contract between them. I further recognize that the states must obtain congressional approval pursuant to article I, section 10, clause 3, of the United States Constitution (U.S. Const., art. I, §10, cl. 3) in order to make such amendments to the compact. However, I find it to be a complete leap of logic to conclude, based upon the foregoing, that the two states must pass identical legislation defining Bi-State's status as an entity entitled to the immunities afforded to local public entities within each state. The matter of the status to be afforded Bi-State in this regard is outside the scope of the contract between Illinois and Missouri. In fact, Missouri has unilaterally enacted its own legislation defining a "public entity" in its sovereign immunity law to include "any multistate compact agency created by a compact formed between this state and any other state which has been approved by the Congress of the United States." Mo. Rev. Stat. §537.600(3) (2005). Again, this status,

conferred upon Bi-State by both Illinois and Missouri, only grants an immunity or defense to Bi-State and in no way imposes a power or burden.

The foregoing analysis illustrates that there is no good cause or compelling reason to depart from our holding in *Grady*. In accordance with well-established principles of *stare decisis*, I would therefore answer the certified question in the affirmative. Thus, I would find that the circuit court erred in denying Bi-State's motion to dismiss on the basis that the plaintiff's complaint was filed outside of the statute of limitations applicable to suits against local public entities pursuant to section 8—101 of the Act (745 ILCS 10/8—101 (West 2006)). Accordingly, I would reverse the circuit court's order denying Bi-State's motion to dismiss and remand with directions that the circuit court dismiss this action.